Frederic WEINBERG and Sheilah Guarino on Behalf of Themselves and All Others Similarly Situated, Appellants,

v.

SUN COMPANY, INC. and Sun Company, Inc. (R & M),[1] Appellee.

Marc R. Gordon on Behalf of Himself and All Others Similarly Situated, Appellant,

v.

Sun Company, Inc., and Sun Company, Inc., (R & M), Appellee.

Superior Court of Pennsylvania.

Argued March 2, 1999.

Filed Sept. 10, 1999.

Reargument Denied Nov. 9, 1999.

---

1. Sun Refining and Marketing Company (R & M) appears to be the proper defendant intended. *See In re Sun Co.*, 115 F.T.C. 560 (1992). However, the complaint originally and erroneously named "Sun Company, Inc. (RIM)." Sun noted and corrected this typographical error in its Answer, but the caption has not been corrected. This court has taken the liberty of correcting the caption as per Sun's Answer.

Debora A. O'Neill, Philadelphia, for appellants.

John Baughman, Philadelphia, for appellee.

Before McEWEN, President Judge, POPOVICH, J., and CIRILLO, President Judge Emeritus.

CIRILLO, President Judge Emeritus:

¶ 1 Before us is the trial court's denial of a motion for a class certification under Pennsylvania Rule of Civil Procedure 1702. The underlying action is predicated upon Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73

P.S. §§ 201–1–201–9.3.[2] Appellants have proposed a class of gasoline consumers who purchased Sunoco Ultra® 93.5 or 94 octane gasoline ("Ultra®") between the years of 1990 and 1992. During this time, the corporate appellee, a Pennsylvania corporation once known as Sun Oil Company (hereinafter "Sun" or "Sunoco"), broadcast in seventeen states[3] approximately $14 million dollars' worth of television and radio advertisements for Ultra®. The FTC has found that these ads claimed directly and by implication that Ultra® would provide more engine power, acceleration, and performance advantages in automobile engines than mere knock prevention. Appellants claim the ad campaign deceived consumers into thinking they would gain a benefit from using 93.5 or 94 octane gasoline as opposed to a lower octane gasoline, while in truth, all but a small percentage of consumers would derive no advantage at all. They also claim the ads increased both consumer demand for and the price of Ultra. They seek compensatory and punitive damages, as well as the equitable relief of corrective consumer disclosures. Judge Stephen E. Levin of the Philadelphia County Court of Common Pleas denied class certification and issued an opinion as required by Rule of Civil Procedure 1710. We affirm in part, reverse in part, and remand.

¶ 2 The subject advertisements represented, in part, "No other gasoline can give your car **better acceleration** because no other gasoline has 94 octane," and invited consumers to "[c]ome to Sunoco and fill up with Ultra® 94—for **maximum power and performance**." (Emphasis added.) Neither party disputes that Ultra® is the highest octane gasoline available to the general public. Whether higher octane provides such advantages as Sun claims is an entirely different matter. Sun has conceded, in a previous case involving similar ads, that its high octane gasoline does not provide benefits aside from knock prevention in cars that knock at a lower octane. It has also presented evidence in this case that its competitors were airing ads with essentially the same message during the proposed class period.

¶ 3 This dispute has an extensive history. It is not the first time Sun, a company based in the Philadelphia area, has broadcast such ads. Sun has for decades made a point of offering the highest octane gasoline available for sale to the general public, and it has long attempted through advertising to convince consumers that there are widespread advantages to purchasing the highest octane gasoline possible.

¶ 4 This is also not the first time attempts have been made to restrain Sun from making claims identical to those at hand. The Federal Trade Commission (FTC) has attempted to stop Sunoco from making its claims that high octane provides more power at least twice since 1974. *See In re Sun Co.*, note 1 *supra*; *In the Matter of Sun Oil Company, et al.*, 84 F.T.C. 247 (1974). Its 1992 attempt involved the very same ads as those before us. Additionally, one of the appellants has attempted to take action against Sun for these same ads, claiming standing under the Lanham Act[4] in our federal courts and producing a landmark case on that Act, and also gaining, then losing, class certification in the state of New Jersey.[5] We

---

**2.** Claims were also brought under other legal theories, but these are not before us.

**3.** Sun manufactured and marketed its Ultra® gasoline in 23 states plus the District of Columbia, but its expert testified that the ads did not air in D.C. nor in 6 of the other states. Appellants state that the broadcasts occurred in 13 states and D.C. Other testimony we have reviewed indicates the number of states where the ads aired was 15. This confusion is irrelevant to the disposition of the case, but we note it.

**4.** 15 U.S.C. § 1125(a).

**5.** *Guarino v. Sun Co.*, 819 F.Supp. 405 (D.N.J. 1993), *aff'd sub nom. Serbin v. Ziebart Int'l Corp.*, 11 F.3d 1163 (3d Cir.1993); Camden County No. L 00192–94 (unpublished opinion dated March 21, 1995, per the Honorable Barry Weinberg of the Superior Court of the State of New Jersey, Camden County).

find these prior proceedings instructive and will not ignore them.

¶ 5 The Federal Trade Commission Act [6] provided the model for the Uniform Deceptive Trade Practices Act (UDTPA), a model statute promulgated by the Council of State Governments in conjunction with the FTC. *Commonwealth v. Hush–Tone*, 4 Pa. Commw. 1, 20 (1971). This Commonwealth's UTPCPL, 73 P.S. sections 201–1–201–9.3, under which the present action is brought, is based upon the UDTPA and thus also upon the FTC Act. *Pennsylvania Retailers' Assos., Reliable, Inc. v. Lazin*, 57 Pa.Commw. 232, 426 A.2d 712 (1981). States' enactments of the UDTPA such as our UTPCPL are thus sometimes known as "Baby FTC" statutes. Weston, Maggs, Schechter: *Unfair Trade Practices and Consumer Protection* 5th Ed. (West 1992) at 727–30. The UTPCPL is also based upon the Lanham Act. *See* Note 4 *supra*. In what is still the landmark Pennsylvania case on the UTPCPL, *Commonwealth v. Monumental Properties, Inc.*, 459 Pa. 450, 329 A.2d 812 (1974), our supreme court stated:

> The Consumer Protection Law has regularly been interpreted by the Commonwealth Court as being based on the Federal Trade Commission Act and the Lanham Trademark Act. Indeed, in all relevant aspects the language of section 3 of the Consumer Protection Law and section 5 of the FTC Act is identical. The Lanham Act's similarity to the Consumer Protection Law is likewise strong. We thus agree with the Commonwealth Court that " 'we may look to the decisions under those Acts for guidance and interpretation.' "

*Id.* at 461–62, 329 A.2d at 817–18 (footnotes and citations omitted).[7] Therefore, the federal cases involving the present dispute are relevant. Additionally, although the class in the case at hand has since been decertified by the New Jersey court,[8] that proceeding is also most certainly instructive as it involved the same litigants and dispute, albeit somewhat different laws.

¶ 6 Thus viewed, the history of this action begins with a consent decree issued by the FTC in 1974. *See Sun Oil Company, supra*. Sun had between 1969 and 1972 produced and caused to be broadcast televised advertisements very similar to those before us. These ads featured what was at that time the highest octane gasoline available for sale to the general public, a leaded variety with a Research Octane of 102.8 called "Sunoco 260." The ads showed feats of purportedly superior engine strength including an automobile pulling three train cars (two boxcars and a caboose) and an automobile pulling an empty U-haul trailer up a ramp constructed over a bank of seats in the Los Angeles Coliseum. Sun's ads represented directly and by implication that "Sunoco 260" provided more engine power than lower octane gasoline and that using Sunoco's special "blending" pump would allow consumers to enjoy such engine power benefits even if they blended a small amount of "260" with a greater amount of lower octane gasoline. The FTC found both that the ads associated higher octane with greater engine power and performance and that this association was a falsehood.

6. 15 U.S.C. § 41 *et seq.*

7. The *Monumental Properties* court took note of the FTC Act's breadth:
 > The House Conference Report that accompanied the original passage of the FTC Act states:
 > > It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task.
 > *Monumental Properties* at 463, 329 A.2d at 818, *quoting* H.R.Conf.Rep.No.1142, 63d Cong., 2d Sess. 19 (1914).

8. *See* discussion *infra*.

¶ 7 The 1974 FTC decision against Sun and its New York-based advertising agency which led to a later consent decree was written by Administrative Law Judge (ALJ) Harry R. Hinkes and was adopted by and issued on behalf of the FTC. It included the following findings of fact based on stipulations and/or admissions, which are directly relevant and essential to understanding the present dispute:

> Octane, which is measurable in different ways, is a measure of motor fuel anti-knock quality, regardless of the method of measurement. The anti-knock quality is one of many measurable properties of a gasoline.
>
> An octane number or octane rating of a gasoline is a measure of the anti-knock quality of a gasoline or its ability to resist knock during combustion in an engine and an octane number or octane rating of a gasoline can be measured in different ways.
>
> Knock, or as it is sometimes called ping or detonation, is the uncontrolled excessively rapid reaction of a portion or all of the air-fuel mixture in the combustion chamber of the engine.
>
> Knock can also result in a loss of engine power.
>
> **The sole function of octane is to control knock.** Knock and the possible resultant power loss can be prevented by using any gasoline that has sufficient octane anti-knock quality. **Use of a gasoline with an anti-knock quality exceeding the requirements of a particular engine is non[-]advantageous as far as preventing knock is concerned.**

*Id.* at findings of fact (FF) 54, 55 (references to pleadings and quotation marks omitted) (emphasis added).

¶ 8 The FTC's decision also found as fact that Sun's advertising agency made use of "research showing that among adult men octane is considered to be a measure of quality, that Sunoco has the highest octane gasoline on the market, that some users associate Sunoco's highest octane with more power and that many users were confused or ignorant about the concept of octane." *Id.* at FF 69. No finding indicated, however, what caused these widespread misperceptions and erroneous associations among adult men prior to the subject ads, which had aired between 1969 and 1972.

¶ 9 During the 1974 proceeding, Sun conceded that using a higher octane gasoline than is needed to control engine knock provides no superior engine performance or other advantage. *Id.* at FF 61, 76.

¶ 10 The FTC found the Sun ads deceptive, stating that "[t]he **element of power is not an attribute of the octane rating except insofar as knock is prevented.**" *Id.* at Comment (emphasis added). It concluded that "[r]espondents have engaged in unfair methods of competition in commerce and have committed unfair and deceptive acts and practices in commerce in violation of Section 5 of the Federal Trade Commission Act." *Id.* at Conclusions of Law.

¶ 11 In fashioning a remedy, the FTC considered studies showing that consumers' misinformed beliefs about the correlation between octane and power had continued after the ads had been discontinued in 1972. This indicated to the FTC that Sunoco's prior deception had continued to cause consumers to overspend unnecessarily on gasoline. However, the FTC recognized that the percentage of consumers with such beliefs had declined rapidly in 1974 due to unique and radical changes in the gasoline market caused by redesigned, environmentally cleaner engines requiring the use of unleaded [9] (lower octane) fuels,

---

9. Lead is not a normal component of gasoline, despite the existence of another advertising campaign of that era implying that oil companies were expending extra effort to "get the lead out." Sun's expert referred in this case to oil companies' exploitation of the anti-pollution mood of the time with their campaigns for "lead-free" gasolines. Lead was, prior to the mid–1970's, added to gasolines specifically because it had the effect of

the "oil crisis" of the day, and an emphasis in marketing on cars' fuel efficiency, stating:

> Finally, one cannot overlook the change in the conditions affecting the marketing of gasoline since Jan. 1972. The supply of gasoline has become limited and its price has risen very noticeably at retail. Automobile engines have been changed and practically all models now use lower octane fuel.
>
> * * *
>
> In any event, with the change in marketing conditions in the sale of gasoline, it.is not likely that power and high octane ratings will be advertised in the near future. **Nevertheless, should the gasoline situation change sometime in the future, as many hope it will, respondents should be prohibited from resurrecting their deceptive claims of power for their gasoline. Therefore, a cease and desist order is necessary.**

*Id.* (Emphasis added.) The FTC's order, agreed to by Sun as a consent decree, mandated that Sun and its advertising agency cease and desist from, among other things, "**Misrepresenting, in any manner, the performance characteristics of Sunoco gasoline or any other gasoline.**"

*Id.* at Order, E (emphasis added). No penalty was built into the order should Sun choose to violate it, and corrective advertising was deemed unnecessary.

¶ 12 Twenty years later, the FTC took action against Sunoco for repeating the claims it had earlier agreed not to make. In late 1991, the FTC issued a press statement announcing that Sun Company, Inc., and its subsidiary, Sun Refining and Marketing (R & M) Company, had agreed to settle FTC charges that Sun had again claimed its highest octane gasolines, now called Ultra® 93.5 and 94, provided superior engine power and performance in ads.[10] Sunoco had no reasonable basis to support these assertions. The then-proposed consent order was described as enjoining Sun from making such claims in the future unless it had a reasonable scientific basis to substantiate them.[11]

¶ 13 The 1992 settlement order was adopted by the FTC and reported at *In re Sun Co.*, *supra*, together with a strongly worded dissent by FTC Commissioner Deborah K. Owen, who would have chosen a greater penalty given the earlier FTC action against Sun. The 1992 FTC settlement order, like its 1974 counterpart, did

---

raising octane and thus controlling engine knock.

10. This followed publication of an article entitled "Which Gasoline for your Car?" in *Consumer Reports*, January 1990, which, according to testimony, originally prompted the present action.

11. The press release indicated that, in cooperation with the American Automobile Association (AAA), the FTC had issued a brochure advising consumers to purchase the lowest octane gasoline that their cars could use without knocking, and that purchase of any higher octane gasoline than that was wasteful and unnecessary. *Facts for Consumers*, Bureau of Consumer Protection, FTC, July 1991. Both the FTC and the AAA have continued periodically re-issuing this and similar brochures. *See The Low–Down on High Octane Gasoline*, September 1997 (at *http:// www.ftc.gov/bcp/ conline/pubs/autos/ octane.htm*) ("the recom-

mended gasoline for most cars is regular octane .... [i]n fact, in most cases, using a higher octane gasoline than your owner's manual recommends offers absolutely no benefit"); *FTC Briefs: Saving Money at the Pump*, September 1997 (at *http:// www.ftc.gov/ bcp/conline/pubs/briefs/ octanbrf.htm*); *FTC Facts for Consumers*, May 1996 ("Many experts believe most cars don't need a high octane gasoline to perform properly and efficiently"); *AAA Autogram*, September/October 1995 ("Vehicles that run well—do not knock or ping—on regular grade gasoline will not benefit from using a higher grade of fuel. For those vehicles, premium fuel will not increase power.... "); *AAA News Release*, October 1995 ("premium gas sales are nearing 20 percent of total gas sold but ... less than 10 percent of cars actually need premium's higher octane.... Contrary to popular opinion, premium gas does not provide more power or 'pep,' doesn't improve performance").

not contain any penalty should Sun choose to violate it.

¶ 14 The FTC is not the only adjudicatory body which has had before it one of the present litigants and the present ads. One of the appellants in the present action, Sheilah Guarino, previously pursued essentially this same claim against Sunoco, albeit under the Lanham Act, in our federal court system. *Guarino v. Sun Co.*, note 5 *supra.*[12]

¶ 15 Guarino's federal claim raised the following issue:

> [W]hether § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), grants standing to a retail purchaser of consumer goods, in this instance gasoline from the pump, from a seller who engages in misrepresentation or false advertising with respect to the quality or characteristics of such goods.

*Id.* at 406. Guarino there sought to certify essentially the same class as she does herein. *Id.* In what turned out to be a landmark case on consumer standing under the Lanham Act, the Honorable Joseph E. Irenas of the Federal District Court for the District of New Jersey noted the Lanham Act's purpose of regulating commerce and protecting commercial interests by making actionable certain acts of unfair competition. He then found that consumers had no standing either as competitors or non-competitors under section 43(a) of that Act despite its broad and ambiguous language granting standing to "any person," which had led to debate on the question for years. *Id.* at 409–10. *Compare Arnesen v. Raymond Lee Organization, Inc.*, 333 F.Supp. 116 (C.D.Cal. 1971) (granting consumer standing), *with Colligan v. Activities Club of New York, Ltd.*, 442 F.2d 686 (2d Cir.1971) (denying

consumer standing). He therefore granted Sun's motion for summary judgment, stating:

> To accept plaintiff's argument would be to convert the Lanham Act from a regulation of commercial interests and unfair competition to a catchall consumer protection statute that could apparently be used to challenge any allegedly misleading advertising. While such an expansion of the Act's coverage may be desirable, that is for Congress, not this court, to decide.

*Id.*

¶ 16 Judge Irenas' decision was affirmed decisively by a panel of the Third Circuit. *Serbin v. Ziebart Int'l Corp.*, note 5 *supra.* That court consolidated Appellant Guarino's case with that of purchasers of automobiles who had bought car rust protection after seeing allegedly false advertisements and had then brought a similar Lanham Act consumer claim. The court reviewed the history of the Lanham Act, acknowledging that consumer standing had long been a topic of debate. *Id.* at 1171–76. Indeed, as was pointed out by Guarino in her brief to that court, a 1988 House Judiciary Committee report had "reported favorably a bill that would have amended Section 43(a) to authorize [suit by] 'any person, including a consumer, who believes that he is or is likely to be damaged by the use of any such false description or representation.'" *Id.* at 1178 (*quoting* H.R.Rep. No. 100–1028, 100th Cong.2d Sess., at 32). However, a House–Senate Conference Committee had deleted the provision. *Id.*[13]

¶ 17 In confirming that Congress had not authorized consumer standing, the Third Circuit all but invited Guarino to

---

**12.** Guarino, a resident of New Jersey, claims in the present action that she purchased Ultra® gasoline in Pennsylvania.

**13.** As reported at 135 Cong.Rec. H1207–02 (101st Congress, 1st Session), Mr. Kastenmeier stated:

> While I support the deletion as part of the necessary compromise on this bill, it is unfortunate in the long run. I continue to believe that consumers already have standing to sue under current law, and that the provision that was deleted only clarified that law.

pursue her suit in the courts of New Jersey and/or Pennsylvania instead:

The question of policy that underlies these appeals is not whether false advertising is a bad thing. It is, and consumers are victimized by it. The question of policy is what institution, or set of institutions, should be charged with identifying false advertising, ameliorating its malign consequences, and, in the long run, shrinking its dominion. State courts have substantial authority in this field by virtue of judge-made misrepresentation law, and some state legislatures have, through such legislation as the Uniform Deceptive Trade Practices Act, undertaken to widen that authority. Congress conferred a measure of public enforcement authority on the Federal Trade Commission and, through section 43(a) of the Lanham Act, has vested in the Federal Courts jurisdiction to entertain certain categories of private law suits predicated on claims of false advertising.

\* \* \*

Some have suggested that the Federal Trade Commission has not been a sufficiently effective watchdog of consumer interests, and that the protections afforded consumers in state courts are inadequate. [26] Such seemed to be the view of the House Judiciary Committee in 1988, when it proposed amending section 43(a) expressly to include consumers among those entitled to sue. H.R.Rep. 100–1028 (100th Cong.2d Sess., 1988) 13–14. However, that view did not prevail in Congress at that time.

---

FN26: .... [A] number of states, including some that have adopted the Uniform Deceptive Trade Practices Act, do not authorize consumer class actions, and since ... an individual's damages may be too insignificant to warrant bringing a suit, the federal provisions for class actions would be particularly suitable for use in consumer deception cases. But ... some states, including some large

ones, do authorize consumer class actions....

*Id.* at 1178–79 (citations omitted).

¶ 18 The following year, appellant Guarino turned to the courts of her home state, New Jersey, seeking to certify the same national class. In an opinion dated March 21, 1995, the Honorable Barry Weinberg of the Superior Court of the State of New Jersey, Camden County, certified the class under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8–1 *et seq. See* Camden County No. L 00192–94, note 5 *supra.* However, he limited the class to New Jersey consumers who had purchased Ultra® in that state. Thereafter, Guarino and other appellants filed in Pennsylvania, basing their action upon purchases made in this state and proposing a national class. In 1996, after the filing of the original complaint in the present action but prior to the filing of appellants' amended complaint, Sun filed a motion to decertify the class in New Jersey on the grounds that Guarino was pursuing a national over a state claim, and that the New Jersey class members should have the option to pursue their claims in Pennsylvania "where their claims would be broader in terms of both causes of action and of geography." Sun argued that the New Jersey state class was a part of the Pennsylvania national class, and thus, in the interest of economy, the case should be litigated in Pennsylvania. On May 10, 1996, the New Jersey court decertified the class.

¶ 19 Appellants then continued their claim solely in this Commonwealth's courts. In the Philadelphia County Court of Common Pleas, appellants alleged that due to the ads, sales of Ultra® had increased and the price of Ultra® had been higher than it would otherwise have been during the proposed class period. They averred the ads had been a substantial factor in their deciding to buy Ultra®, which they would not have done had they known that it did not give their engines greater power. The ads had also caused them to pay more for Ultra® gasoline than

they would otherwise have paid. They sought to certify in our courts a class of:

All persons in the United States who purchased Sunoco Ultra® 93.5 and 94 gasoline for personal, family or household purposes from February 22, 1990 through May 6, 1992. Excluded from the Class are defendants Sun Company, Inc. and Sun Company, Inc. (R & M) and defendants' officers and directors.

The proposed class for certification was not limited to those who relied upon the ads.[14]

¶ 20 At the class certification hearing, it was appellants' position that under the UTPCPL, 73 P.S. §§ 201–1–201–9.3, reliance on Sunoco's allegedly deceptive ads need not be shown by each member of the class before the class may be certified. Appellants claimed essentially that, for purposes of this Commonwealth's causation requirements for class certification, damages to all Ultra® consumers during the class period have been shown, once it has been demonstrated that the Sun's ads caused price inflation of Ultra®, and that some consumers' purchasing decisions were causally connected to the false statements in the ads.

¶ 21 Sunoco countered that appellants had not satisfied the causation requirements for class certification because under the UTPCPL, individual detrimental reliance on the ads must be shown. This, it claimed, would render class certification inappropriate. It also argued that a national class may not be certified by a Pennsylvania court.

¶ 22 After an extensive hearing, the Honorable Stephen E. Levin of the Court of Common Pleas of Philadelphia County agreed with Sunoco on both points. He denied class certification and simultaneously issued an opinion as required by

Rule of Civil Procedure 1710, setting forth his findings of fact, conclusions of law, and the basis for his decision. Pa.R.C.P. 1710, 42 Pa.C.S. Appellants filed a timely notice of appeal.

¶ 23 On appeal, appellants present the following issues for resolution:

1. Whether a claim for violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law requires proof of a plaintiff's actual reliance upon an allegedly false or deceptive statement even if the false or deceptive statement caused the plaintiff monetary damage by raising the cost of the product the plaintiff purchased?

2. Whether a Pennsylvania court may certify a class consisting of members of several states when (a) the defendant is a Pennsylvania corporation, (b) the defendant's principal place of business is in Pennsylvania, (c) the defendant's deceptive conduct was conceived in and disseminated from Pennsylvania, and (d) Pennsylvania has the most significant contacts with all aspects of the litigation?

¶ 24 Preliminarily, we note that a denial of class certification is no longer considered a final order under amended Rule of Appellate Procedure 341, for it does not dismiss all claims or all parties; however, in appropriate cases, it is considered appealable under Rule of Appellate Procedure 312 or 313. Note, Pa.R.A.P. 341. Our court has determined that a class action certification denial, under circumstances similar to those in the case before us, is appealable as a collateral order. *DiLucido v. Terminix Int'l*, 450 Pa.Super. 393, 676 A.2d 1237 (1996). In *DiLucido*, we found the standards of Pa.R.A.P. 313[15] had been met

---

14. Frederic Weinberg withdrew as a class representative, though not as a plaintiff, during the course of the class certification hearings. He is the one appellant who did not recall the ads' assertions, as the certification court noted in its findings of fact.

15. Pa.R.A.P. 313 provides:
 (a) **General Rule.** An appeal may be taken as of right from a collateral order of an administrative agency or lower court.
 (b) **Definition.** A collateral order is an order separable from and collateral to the

because 1) the order denying class certification was separable from and collateral to the primary cause of action for UTPCPL-predicated liability; 2) class actions were established in order to provide small claimants with a method of compensation for claims otherwise too small to litigate, and this right is too important to be denied review; and 3) since any small claimants would be turned away without recourse even if large claimants obtained a remedy individually, the small claims would be irreparably lost unless certification be granted. *Id.* at 1239. The same rationale holds true here. The case is properly before the court. We turn to our standards.

¶ 25 It is the strong and oft-repeated policy of this Commonwealth that, in applying the rules for class certification, decisions should be made liberally and in favor of maintaining a class action. *Weismer by Weismer v. Beech–Nut Nutrition Corporation*, 419 Pa.Super. 403, 615 A.2d 428, 431 (1992); *D'Amelio v. Blue Cross of Lehigh Valley*, 347 Pa.Super. 441, 500 A.2d 1137, 1141 (1985); *Janicik v. Prudential Ins. Co.*, 305 Pa.Super. 120, 451 A.2d 451, 454 (1982); *Bell v. Beneficial Consumer Discount Co.*, 241 Pa.Super. 192, 360 A.2d 681, 688 (1976). This is because such suits enable the assertion of claims that, in all likelihood, would not otherwise be litigated. *Bell, supra.* "The court may alter, modify, or revoke the certification if later developments in the litigation reveal that some prerequisite to certification is not satisfied." *Janicik, supra* at 455, *citing* Pa.R.C.P. 1710, 1711.

¶ 26 At a class certification hearing, the burden of proof lies with the proponent, but, this being a preliminary hearing, it is not a heavy burden. *Janicik, supra* at 455. The proponent need only present evidence sufficient to make out a *prima facie* case "from which the court

can conclude that the five class certification requirements are met." *Id.* This will suffice unless the class opponent comes forward with contrary evidence; if there is an actual conflict on an essential fact, the proponent "bears the risk of non-persuasion." *Id.* at 456. Requiring an "affirmative showing" that the requirements have been met for class certification is, however, inappropriate, because "the stage of proceedings at which the class certification is to be initially determined and the trial court's extensive supervisory powers over class actions obviate the need for a strict burden of proof." *Id.* at 454–55.

¶ 27 Trial courts are vested with broad discretion in making such decisions. *Klemow v. Time, Inc.*, 466 Pa. 189, 197, 352 A.2d 12, 16 (1976); *Prime Meats v. Yochim*, 422 Pa.Super. 460, 619 A.2d 769, 773 (1993). "Accordingly, the lower court's order denying class certification will not be disturbed on appeal, unless the court neglected to consider the requirements of the rules or abused its discretion in applying them." *DiLucido, supra* at 1240 (*citing D'Amelio, supra* at 1141).

¶ 28 The five class certification requirements are found at Pennsylvania Rule of Civil Procedure 1702:

> One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;
>
> (4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709;[16] and

Pa.R.A.P. 313, 42 Pa.C.S.

16. Rule 1709 reads:

main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.[17]

Rule 1702, Pa.R.C.P., 42 Pa.C.S. Unlike its federal counterpart at Fed.R.Civ.P. 23(b), Pennsylvania's rule does not require that the class action method be "superior" to alternative modes of suit. *Janicik, supra* at 461; Explanatory Comment, Rule 1708.

■ ¶ 29 In interpreting the UTPCPL, we must adhere to its purpose. "The purpose of the UTPCPL is to protect the public from fraud and unfair or deceptive business practices, and the statute is the principal means for doing so in the Commonwealth." *Pirozzi v. Penske Olds–Cadillac–GMC, Inc.*, 413 Pa.Super. 308, 605 A.2d 373, 375 (1992). Our supreme court stated in *Monumental Properties, supra*:

> In determining whether the representative parties will fairly and adequately assert and protect the interests of the class, the court shall consider among other matters
> (1) whether the attorney for the representative parties will adequately represent the interests of the class,
> (2) whether the representative parties have a conflict of interest in the maintenance of the class action, and
> (3) whether the representative parties have or can acquire adequate financial resources to assure that the interests of the class will not be harmed.
>
> Pa.R.C.P. 1709, 42 Pa.C.S.

17. Rule 1708 provides:
> In deciding whether a class action is a fair and efficient method of adjudicating the controversy, the court shall consider among other matters the criteria set forth in subdivisions (a), (b) and (c).
> (a) Where monetary recovery alone is sought, the court shall consider
> (1) whether common questions of law or fact predominate over any question affecting only individual members;
> (2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;
> (3) whether the prosecution of separate actions by or against individual members of the class would create a risk of
> (i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatible standards of conduct;

[T]he Consumer Protection Law was designed to equalize the market position and strength of the consumer vis-a-vis the seller. A perception of unfairness led the Legislature to regulate more closely market transactions. The mischief to be remedied was the use of unfair or deceptive acts and practices by sellers.

\* \* \*

·We cannot presume that the Legislature when attempting to control unfair and deceptive practices in the conduct of trade or commerce intended to be strictly bound by common-law formalisms. Rather the more natural inference is that the Legislature intended the Consumer Protection Law to be given a

> (ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;
> (4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;
> (5) whether the particular forum is appropriate for the litigation of the claims of the entire class;
> (6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;
> (7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action.
> (b) Where equitable or declaratory relief alone is sought, the court shall consider
> (1) the criteria set forth in subsections (1) through (5) of subdivision (a), and
> (2) whether the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final equitable or declaratory relief appropriate with respect to the class.
> (c) Where both monetary and other relief is sought, the court shall consider all the criteria in both subdivisions (a) and (b).
>
> Pa.R.C.P. 1708, 42 Pa.C.S.

pragmatic reading—a reading consistent with modern day economic reality.

*Id.* at 467–70, 329 A.2d at 820–22.

¶ 30 Having established the governing standards, we turn to the issues presented, taking them out of order.

¶ 31 We may dispose of appellants' second issue swiftly. In a footnote of its opinion pursuant to Rule of Civil Procedure 1710, the certification court expressed its conviction that, under *Klemow, supra,* it was precluded from certifying a national class. This was error. A Pennsylvania court may certify a national class. *Klemow, supra,* is not to the contrary:

> Because the jurisdiction of the courts of the Commonwealth is territorially limited, the class may consist only of Pennsylvania residents. **The class may also include non-residents who submit themselves to the jurisdiction of the state courts.**

*Id.* at 197 n. 15, 352 A.2d at 16 n. 15 (citations omitted) (emphasis added). A year after this 1976 pronouncement, our procedural rules *regarding* class certification were changed. They now provide an explicit procedure for residents of other states to submit themselves to our jurisdiction and be included in Pennsylvania class actions. *See* Pa.R.C.P. 1711; Explanatory Note following Pa.R.C.P. 1711 (1977). The 1977 Explanatory Note following Rule 1701 also contains a discussion of the status of non-residents and *Klemow,* referring to Rule 1711(b)(2) for the procedure to be used in such cases. That Note clarifies that *Klemow* did not involve "a situation where Pennsylvania has the most significant relationship to all aspects of the transaction, so that Pennsylvania might assume jurisdiction over non-resident members of the class in a manner parallel to long-arm jurisdiction over non-resident aliens." Explanatory Note following Pa. R.C.P. 1701 (1977). *See Phillips Petroleum v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (state court may properly exercise jurisdiction over multistate class and may bind class members if notice, opt-out, and representation requirements are met). *See also Prince George Ctr. v. United States Gypsum Co.,* 704 A.2d 141 (Pa.Super.1997), *appeal denied,* 557 Pa. 640, 732 A.2d 1210, 1998 Pa. LEXIS 2623 (1998) (certifying national trial and settlement classes).

¶ 32 We proceed to the first issue.

¶ 33 At the certification hearing, each side presented an expert on the issue of causation; appellants presented a university economics professor who specializes in microeconomics, and Sun presented a business school marketing professor. Appellants' economist stated his opinion that Sun's ads caused the demand for and thus the price of Ultra® to be higher during the class period, causing harm to all people who purchased Ultra® during the class period.[18] This number was estimated to be in the millions.

¶ 34 Sun's marketing professor, on the other hand, stated that in his expert opinion, the class of people harmed by the allegedly false ads was limited to those who were induced to buy Sun Ultra® solely due to the ads' representations that it provided greater engine performance and power. He provided calculations showing that during the class period, Sunoco's market share in the 17 states was 4.7 million consumers. Using a hierarchy of effects or "decision tree" analysis, sorting based upon several factors,[19] he estimated that

**18.** Judge Levin found as fact that during the class period, the Ultra® gasolines at issue were priced at least fifteen cents higher per gallon than non-premium grades of gasoline. Premium was defined as being 91 octane or above.

**19.** Two of these are worthy of note. One was a determination that business use purchases in five states. should be excluded from the analysis because those states do not allow recovery in a class action for drivers who purchased the gasoline for their business, not just personal, use. The other was a further subdivision of those who had actually perceived the implication that Ultra® would give greater power, into two groups: the first com-

the number of people in states where such claims are allowed, who had seen the ad, perceived its implied message, believed it, found the increased gas power justified the higher price, and had relied solely on that message to make a purchase of Ultra®, was approximately 2,987, a group which he refused to characterize as "customers." He stated that of those, the number of repeat customers, or "customers," would be between one and 597. He testified it would be impossible to determine who these people were because consumer studies had not been performed at the time.

¶ 35 The certification court concluded that appellants could not meet the first three requirements of Rule 1702, numerosity, commonality, and typicality, because "the element of reliance has been omitted from the class definition." The court predicated this conclusion on its statement that all of appellants' UTPCPL claims sounded in fraud, noting in its Rule 1710 opinion that "[a]n individual showing of reliance on the part of each potential plaintiff is . . . required in fraud-based suits."

¶ 36 As to numerosity, the court stated that "identifying the injured parties would be impossible without an individual inquiry that would make certification improper." For this reason, it found, the class could not be sufficiently identified. When a class is narrowly drawn, but there are still so many potential members that joinder is impracticable, the class satisfies the numerosity requirement. *Weismer by Weismer, supra* at 430. However, where the class definition is so poorly established that the court is unable to ascertain who the potential class members are, then the numerosity requirement is not met. *Id.* The court found the latter situation was before it due to the necessity of a showing

of reliance, thus defeating the first requirement for class certification.

¶ 37 The certification court found that because an individualized showing was necessary, common questions of law and fact were also not present, defeating the second requirement of Rule 1702.

¶ 38 The third requirement, typicality, the court found unfulfilled because, as it has stated in its certification opinion, appellants' claims were "not typical of those belonging to a class of people defrauded as a result of its reliance on alleged misrepresentations or omissions." Weinberg could not recall seeing or hearing the subject advertisements, but Guarino and Gordon remembered them. The court specifically stated that these two appellants were typical of a class composed of those who did see or hear the ads and "who purchased Ultra®—at least in part—because they believed it would enhance their cars' performance." However, the court refused to certify such a class, finding that reliance was necessary.

¶ 39 The court did not engage in an analysis of subsections (4) and (5) of Rule 1702, finding that superfluous as per *Weismer, supra*, in light of its conclusions as to the first three requirements of that Rule.

¶ 40 It is thus readily apparent that the entirety of Judge Levin's findings concerning Rule 1702 hinge on his conclusion that appellants must demonstrate reliance upon the advertisements in order to fulfill the UTPCPL. Therefore, appellants' challenge to this conclusion alone implicates the entirety of his findings and conclusions as to class certification.

¶ 41 To ascertain whether a showing of reliance is indeed required, we turn to the language of the UTPCPL. The amended complaint, filed on October 7, 1996,[20] alleges Sun committed the following

posed of those who actually believed this misrepresentation (which he estimated at 18,-000), and the second, of those who did not, due to general skepticism (which he estimated at 36,000). As to this latter division, *see* Note 22 *infra*.

20. The UTPCPL was amended on December 4, 1996, effective in 60 days. Since the amended complaint was filed before this date, the prior version of the UTPCPL applies to this case.

actions (classed as "unfair or deceptive acts or practices") under 73 P.S. section 201–2(4):

> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

> \* \* \*

> (vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

> \* \* \*

> (ix) Advertising goods or services with intent not to sell them as advertised;

> \* \* \*

> (xvii) Engaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. § 201–2(4). These actions are made unlawful by section 201–3 of the same Act. 73 P.S. § 201–3.

¶ 42 We interpret the UTPCPL bearing in mind guidelines based on the statute's purpose as set forth by our supreme court in *Monumental Properties, supra* :

> The Legislature sought by the Consumer Protection Law to benefit the public at large by eradicating, among other things, "unfair or deceptive" business practices. Just as earlier legislation was designed to equalize the position of

employer and employee and the position of insurer and insured, this Law attempts to place on more equal terms seller and consumer. These remedial statutes are all predicated on a legislative recognition of the unequal bargaining power of opposing forces in the marketplace. Instantly, the Legislature strove, by making certain modest adjustments, to ensure the fairness of market transactions. No sweeping changes in the legal relationships were occasioned by the Consumer Protection law, since prevention of deception and the exploitation of unfair advantage has always been an object of remedial legislation.

> \* \* \*

> Since the Consumer Protection Law was in relevant part designed to thwart fraud in the statutory sense, it is to be construed liberally to effect its object of preventing unfair or deceptive practices.

*Id.* at 457–60, 329 A.2d at 815–17 (footnotes and citations omitted).[21]

 ¶ 43 Not all "unfair or deceptive" business practices under the statute are in the nature of fraud. 73 P.S. § 201–2(4). The UTPCPL is of a *sui generis* nature and "encompasses an array of practices which might be analogized to passing off, misappropriation, trademark infringement, disparagement, false advertising, fraud, breach of contract, and breach of warranty." *Gabriel v. O'Hara*, 368 Pa.Super. 383, 534 A.2d 488, 494 (1987) (citing individual subsections of § 201–2(4)) (footnotes omitted).

¶ 44 Of the claims stated in the amended complaint before us, two are in the nature of fraud: (vii) (marketing of altered or

---

21. Sun points out to us that at the time *Monumental Properties* was decided, private actions were not authorized under the UTPCPL, but only actions by the Attorney General on behalf of the public. Therefore, Sun claims, the statement of purpose we have just quoted is "dangerously misleading." We disagree. Far from diminishing the applicability of the policy statements expressed in the quoted language, the legislature's later addition of private consumer standing to the UTPCPL, if anything, enhances the quoted statements' applicability. The advent of consumer standing did not weaken but greatly fortified the statute's purpose of protecting the public at large.

inferior goods) and (xvii) (miscellaneous fraudulent practices). However, two are in the nature of false advertising: (v) (deceptive marketing of goods, services, or businesses) and (ix) (bait advertising). *Id.*

¶ 45 The certification court failed to note the difference between these two categories. Its conclusion that appellants must show reliance was based on the premise that all of appellants' UTPCPL claims sound in fraud. For this it relied upon *DiLucido, supra* at 1241. The certification court continued, in its Rule 1710 opinion:

> An individual showing of reliance on the part of each potential plaintiff is, therefore, required in fraud-based suits. "Because such a showing would normally vary from person to person, [fraud claims are] not generally appropriate for resolution in a plaintiff-class action." *Klemow*, 466 Pa. at 197 (n.17), 352 A.2d at 16 (n.17).

(Brackets in original.) Although we agree with that court's conclusion as to fraud-based suits, we cannot agree with its premise that this is a case based entirely in fraud. To find support for our position we need look no further than *DiLucido* itself.

¶ 46 *DiLucido* has much in common with the case at hand, for it was also a class action brought under the UTPCPL in which one of the issues was whether reliance need be proven under, among other provisions, 73 P.S. § 201–2(4)(v). As did the court herein, the certification court in *DiLucido* had concluded that the elements of common law fraud, including reliance, must be shown under all sections of the UTPCPL, reasoning that all UTPCPL sections are grounded in fraud. *DiLucido* at 1239.

¶ 47 On appeal, we specifically refuted this broad proposition, noting that a showing of reliance is not a requirement of the UTPCPL itself, but rather of common law fraud. *Id.* at 1240–41. While granting that the elements of common law fraud indeed must be proven under those sections of the UTPCPL grounded in fraud, we nonetheless maintained steadfastly our conviction, earlier expressed in *Gabriel, supra*, that several UTPCPL sections are simply not fraud-based and do not, therefore, require a showing of reliance. We then more explicitly specified:

> If we explored the parallel actions for the deceptive conduct delineated in section 201–2(4), we would discover various standards for the distinct and separate deceptive practices. It would, therefore, seem logical to apply those same standards for actions under the corresponding sections of 201–2(4) of the UTPCPL, so that persons would not be subject to differing standards for identical conduct.

*DiLucido* at 1240. Applying this concept, we noted that the commonwealth court had in 1971 set forth the elements which must be shown to prove a violation of 201–2(4)(v), the UTPCPL equivalent of false advertising. *Id.* at 1240–41. Those elements are:

> (1) that defendants' advertisement is a false representation of a fact, (2) that it actually deceives or has a tendency to deceive a substantial segment of its audience, and (3) that the false representation is likely to make a difference in a purchasing decision.

*Commonwealth v. Hush–Tone Indus., supra* at 21 (1971). This formulation was directly adopted by the superior court in *DiLucido* and has been reiterated by this court most recently in *Fay v. Erie Ins. Group*, 723 A.2d 712, 714 (Pa.Super.1999). These elements are identical for section 201–2(4)(ix), also a false advertising equivalent, but one which was not examined in *DiLucido. Gabriel, supra* at 494 n. 14. The false advertising elements include neither reliance nor actual belief in the ads' claims.[22] It should be noted that there is

---

22. Sun argues that a party who has seen but has not been deceived by a false advertisement (due to general skepticism and consumers' jaded views of ads) should not be able to

no common law equivalent of this sort of false advertising. This is not a claim of fraudulent or negligent misrepresentation; rather, it is a cause of action modeled upon the FTC Act, with the elements as stated above.[23]

¶ 48 Although in *DiLucido* we found reliance need not be shown under section 201–2(4)(v), we emphasized that causation cannot be overlooked:

> Appellants are correct in their contention that they are not required to prove the elements of common law fraud to establish violations of sections (ii), (v), and (xvi). However, this does not relieve them of the burden of establishing a causal connection to or reliance on the alleged misrepresentations of appellee. We note that section 201–9.2(a) of the

UTPCPL, providing for private actions, states, in relevant part:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers **any ascertainable loss** of money or property, real or personal, **as a result of** the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act . . .

73 P.S. § 201–9.2 (emphasis added). Certainly, the use of the phrase "as a result of" indicates the intent of the Legislature to require a causal connection between the unlawful practice and a plaintiff's loss. Accordingly, we find that in order to proceed with their claims under the UTPCPL, Appellants must be able to establish that the al-

---

make a claim. Its marketing expert based his decision tree, in part, upon his theory that of those who perceived the ads' power and acceleration message, only one-third of them would actually have believed it. We reject this position, and we specifically adopt the following passage from *Hush–Tone, supra* as a correct interpretation of our law regarding subsections (v) and (ix) of the UTPCPL. Quoting from a United States Supreme Court opinion, our commonwealth court wrote:

> With specific reference to untruthful advertising the late Mr. Justice Hugo Black pertinently stated of the Federal Trade Commission Act: "The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting on a citizen to suspect the honesty of those with whom he transacts business. Laws are made to protect the trusting as well as the suspicious. The best element of business has long since decided that honesty should govern competitive enterprises, and that the rule of *caveat emptor* should not be relied upon to reward fraud and deception." *F.T.C. v. Standard Ed. Soc.,* 58 S.Ct. 113, 115, 302 U.S. 112, [116,] 82 L.Ed. 141[, 144–45] [ (1937) ]. Hence it is no defense to a claim of false advertisement that no right thinking person would believe the claim, because the act is intended to protect the ignorant and unthinking and credulous members of the general public. *Charles of the Ritz Distributors Corp. v. F.T.C.,* 143 F.2d 676 (2d Cir.1944). A state-

ment which creates a deceptive impression upon purchasers is proscribed although the statement might technically be true. *L.G. Balfour Co. v. F.T.C.* , 442 F.2d 1 (7 th Cir.1971). It is the meaning that is conveyed to the average reader which must be sought out. *Grove Laboratories v. F.T.C.,* 418 F.2d 489 (5 th Cir.1969). It is the meaning and impression arising from the sum total not only of what is said but also of all that is reasonably implied that is significant. *Spiegel, Inc. v. F.T.C.,* 411 F.2d 481 (7 th Cir.1969). Regard must be had not to fine spun distinctions and arguments that may be made in excuse but to the effect which the claims might be expected to have upon the general public. *Stein's v. Pilling,* 256 F.Supp. 238 (D.C.N.J.1966).

*Hush–Tone, supra* at 21–22.

23. Sun has made extensive policy arguments that false advertising claims are not appropriate for class action resolution and have never been considered under section 201–2(4)(v) or (ix) of the UTPCPL. These arguments are inappropriate in light of the coexistence of those subsections and the rules of civil procedure governing class actions, together with the cases we have discussed upholding them. Sun's arguments would more appropriately be addressed to our legislature. We do note, however, that the only other Pennsylvania case aside from those we have cited applying this analysis is at the common pleas level. *See LeBourgeois v. Firstrust Savings Bank,* 22 Phila. 223, 1991 Phila. Cty. Rptr. LEXIS 22 (April 12, 1991).

leged representations by Appellee caused their loss.

*DiLucido* at 1241. Applying this standard, we concluded that neither appellant had presented sufficient evidence to establish that their losses were a result of the misrepresentations by appellee. This failure, in turn, meant that their claims would not be typical of the members of the proposed class and thus would not meet the requirement of Rule 1702(3). *Id.* Therefore, we affirmed the denial of class certification.

¶ 49 *DiLucido* should not, therefore, be read as holding that reliance is required for all UTPCPL claims. Instead, the court therein held that although a showing of reliance is not required to establish violations of sections (ii), (v), and (xvi), nonetheless, a UTPCPL plaintiff must still establish that violation of the statute caused his or her loss. *Id.* at 1241.

¶ 50 *DiLucido* thus articulates the rule that "a plaintiff has the burden of establishing a causal connection to or reliance on the alleged misrepresentations." *Fay, supra* at 714 (quoting *DiLucido, supra*) (emphasis added). This is a generic statement only and does not establish a single standard of causation under the UTPCPL, for, in addition to the general language of section 201–9.2, there are multiple standards for causation under that statute.[24] Nor can we accept the interpretation that "this Court meant plaintiffs had to prove *both*" reliance and a causal connection, as

Sun attempts to convince us. Rather, the precise kind of causation required in a UTPCPL case depends upon the elements of the correlative cause of action upon which the particular unlawful practice of section 201–2(4) is based.

¶ 51 In order to answer the issue posed, we must therefore inquire whether the requisite causal connection, and indeed whether each of the other required elements, has been shown under the standard for (v) and (ix) false advertising articulated in *Hush–Tone* and adopted by our court in *DiLucido* and *Fay*, and whether the common law fraud standards applicable to (vii) and (xvii) have likewise been met, to such a degree (a *prima facie* showing) as to pass the class certification requirements of Rule 1702.

¶ 52 Reliance is indeed an element of common law fraud or misrepresentation. *Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 1999 Pa. LEXIS 1143 (1999). We agree with the certification court that this element necessitates an individualized inquiry. We also agree that appellants' claims under the two fraud-based unlawful practices, (vii) and (xvii), cannot meet the first three requirements of Rule 1702, for the same reasons that court has articulated as set forth above. For this reason, we affirm its denial of class certification as to those claims.

¶ 53 However, as to the false advertising-based claims, (v) and (ix), we find

**24.** As the dissent of our learned colleague astutely notes, a panel of this court recently stated that reliance must be shown under all provisions of the UTPCPL, in a case decided while the case at hand was being considered. *Basile v. H & R Block Eastern Tax Services, Inc.*, 729 A.2d 574, 584 (Pa.Super.1999). However, the unique situation of, specific provision for, and elements of false advertising were not at issue in *Basile*, while they are herein. The over-broad statement of the *Basile* court quoted by the dissent is, therefore, *obiter dictum*. The differing standards which apply to the individual provisions of 73 P.S. section 201–2(4) were not examined in *Basile*. It is clear that the *Basile* court did not intend to overturn *Gabriel*, *DiLucido*, and *Fay* and

the careful distinctions this court had drawn between the various subsections of section 201–2(4) in those cases; however, were the quoted statement from *Basile* to apply literally, that would be the result. Moreover, in making the statement quoted by the dissent, the *Basile* court relied upon *Prime Meats, Inc. v. Yochim*, 422 Pa.Super. 460, 619 A.2d 769, 774 (1993), a case in which solely the fraud-based "catch-all" subsection of § 201–2(4) was at issue, (xvii)—and a case in which this court again carefully limited its language to indicate precisely that it was the common law elements of fraud incorporated via (xvii), and not the UTPCPL, that required a showing of reliance. *Id.*

the elements of a false advertising claim against Sunoco have fairly been made out. *Fay*. For clarity, we shall first address the elements of false advertising and then consider whether the class certification requirements have been fulfilled.

¶ 54 First, the FTC has found false the ads' claim that octane provides greater power; indeed, that was admitted by Sunoco itself in 1974. For purposes of class certification, we need not engage in an extensive analysis of the effect of a higher octane gasoline on the average contemporary automobile engine, or even of which few automobile engines on the road today require 94 as opposed to 91 or even 87 octane, for purposes of class certification. Such analysis has already been performed for us by the FTC itself, both in the proceedings against Sunoco and in its repeated and emphatic warnings to consumers not to believe such claims as Sunoco here made. It is rare to have such a profusion of prior adjudications, even if only advisory, on the very question before a court. Further, the New Jersey court found the claim sufficient for class certification, although we recognize its certification requirements are somewhat different than our own. We acknowledge that Sun presented the testimony of two engineering experts at the class certification hearing in order to prove the truth of the claims in its ads; however, appellants' engine and fuel expert sufficiently and quite credibly rebutted Sun's experts, even apart from the multiple FTC decisions and consumer alert warnings. Even Sun's attorney stated at the close of his argument that the truth or falsity of the ads is for the fact-finder. We agree. Under the applicable standards for class certification, the class proponents, here appellants, have borne their burden of making a *prima facie* showing that there was a false representation of fact, the first element of a false advertising claim under *DiLucido* and *Hush–Tone*. *See Janicik, supra* at 454–55 (requiring class action plaintiffs to "affirmatively show" facts establishing each requirement for certification is inappropriate and inconsistent with law that decisions should be made liberally in favor of allowing class actions; when challenged, however, proponent bears burden of persuasion).

¶ 55 Second, the advertisements' tendency to deceive a substantial segment of the audience has also specifically been found by the FTC. That the advertising was likely to make a difference in the purchasing decision was the subject of expert testimony by appellants' economist, who explained that the fifteen-cent difference per gallon between Ultra® and the mid-grade gasoline was such that consumers would only spend the extra money for Ultra® if they believed they were obtaining a commensurate benefit. Moreover, appellants have made a fair showing that, at trial, they will be able to prove through studies the degree to which the advertising campaign at issue had a tendency to deceive a substantial segment of the audience, causing new consumers to buy and supporting the increased prices for Ultra®. Again, as to this element, we find appellants have borne their burden, despite Sun's rebuttal testimony. *Janicik*.

¶ 56 Finally, the requisite degree of causation is that the false representation is likely to have made a difference in consumers' purchasing decisions. Appellants' economist presented testimony that he would be able to prove this at trial, and plaintiffs themselves testified that it did make such a difference to them. Although Sun's marketing professor presented rebuttal testimony, it was based entirely upon the legal conclusion that reliance would need to be shown, a conclusion we find incorrect. For this reason, Sun has not effectively rebutted appellant's economist. This is sufficient. *Janicik*.

¶ 57 Turning back, then, to the requirements of Rule 1702, we find that under the standards of the UTPCPL false advertising claims we have just reviewed, and on the basis of our review of the record, the class is so numerous that join-

der of all members is impracticable. We also find that there are questions of law or fact common to the class, and that the claims of appellants Guarino and Gordon are typical of the claims or defenses of the parties. Rule 1702's first three requirements have thus been fulfilled.

¶ 58 The fourth and fifth requirements of Rule 1702 have not been addressed by the certification court. However, the fact that the court did not specifically address them in its opinion has not entirely hindered our review of these issues, for several of the relevant factors were fully addressed at the certification hearing. We turn to Rule 1709 to find whether Gordon and Guarino will, as representative parties, fairly and adequately assert and protect the interests of the class as per Rule 1702(4).

¶ 59 As to the attorney's adequacy, "[g]enerally, '[u]ntil the contrary is demonstrated, courts will assume that members of the bar are skilled in their profession.'" *Janicik, supra* at 458, *quoting Dolgow v. Anderson,* 43 F.R.D. 472, 496 (E.D.N.Y.1968). We note the high standards of professionalism of counsel for both sides in the present dispute. As to the second requirement of Rule 1709, that the representative parties have no conflict of interest, we find that although Guarino did at one time present a conflict in the co-existence of her New Jersey action with this one, that conflict is no longer present because the New Jersey class was decertified due to the existence of the case before us. Further, again, courts "have generally presumed that no conflict of interest exists unless otherwise demonstrated." *Id.* at 459. No other conflict has been alleged. As to the third requirement, that the representative parties have or can obtain adequate financial resources sufficient to protect the interests of the class, we are satisfied both by the extensive history of this case as well as by counsel's representations that counsel will advance the costs of litigation. According-

ly, we find the requirements of Rule 1709 have been met.

¶ 60 Rule 1702's fifth requirement is that a class action provide a fair and efficient method of adjudicating the controversy under the standards of Rule 1708, which must be considered here under subsection (c), for appellants seek both monetary and equitable relief. As was noted by appellants' counsel, this is the primary dispute. On the basis of our review of the record, we can conclude only that appellants have borne the burden of persuasion that common questions of law or fact predominate over individual questions, satisfying Rule 1708(a)(1).

¶ 61 However, as to the remaining requirements of Rule 1708, the certification court did not enter any findings, and there is a paucity of record treatment. Although Pennsylvania courts are empowered to certify national classes, they have not often done so, and a consideration of the factors enumerated in Rule 1708 is critical to determining whether such would be appropriate in the case at hand. We find ourselves unable to address these factors. Therefore, we remand this case for a hearing on the remaining requirements of Rule 1708(c) and further proceedings as necessary. The certification court is directed to determine the issue of class certification consistently with this opinion, issuing a supplemental opinion as per Rule of Civil Procedure 1710 which need address only the remaining factors set forth in Rule 1708(c).

¶ 62 Order affirmed as to claims under subsections (vii) and (xvii) of UTPCPL § 201–2(4), 73 P.S. Order reversed as to claims under subsections (v) and (ix) of the same statute. Case remanded for proceedings consistent with this opinion. Jurisdiction relinquished.

¶ 63 McEWEN, President Judge files a Dissenting Opinion.

McEWEN, President Judge, dissenting:

¶ 1 While the opinion of the majority reflects a careful analysis of the intricate legal issues presented by the corporate impudence[25] of appellees, I am obliged to dissent for I would affirm the order of denial of class certification.

¶ 2 The learned Judge Stephen E. Levin concluded "that common questions of law or fact did not predominate the case and that a class action would not be a fair and efficient method of adjudicating the claims [at issue in this action]." *DiLucido v. Terminix International Inc.*, 450 Pa.Super. 393, 676 A.2d 1237, 1239 (1996), *appeal denied,* 546 Pa. 655, 684 A.2d 557 (1996). It is because I perceive neither an abuse of discretion by Judge Levin nor any error of law that I would affirm the order entered June 15, 1998.

> A trial court's decision concerning class certification is a mixed finding of law and fact. *Cribb v. United Health Clubs*, 336 Pa.Super. 479, 480, 485 A.2d 1182, 1183 (1984). A trial court is vested with broad discretion in defining the class based on the commonality of the issues and the propriety of maintaining the action on behalf of the class. *Hayes v. Motorists Mutual Insurance Co.*, 370 Pa.Super. 602, 604, 537 A.2d 330, 331 (1987). On appeal, we will not disturb the trial court's order denying class certification unless the court failed to consider the requirements of the rules of civil procedure or abused its discretion in applying them.

*Weismer v. Beech–Nut Nutrition Corp.*, 419 Pa.Super. 403, 615 A.2d 428, 430 (1992). *Accord: Hanson v. Federal Signal Corp.*, 451 Pa.Super. 260, 679 A.2d 785, 788 (1996); *DiLucido v. Terminix International Inc., supra,* 676 A.2d at 1240; *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa.Super. 441, 500 A.2d 1137, 1141 (1985), *appeal denied,* 514 Pa. 630, 522 A.2d 559 (1986).

¶ 3 Rule 1702 of the Pennsylvania Rules of Civil Procedure provides:

### RULE 1702. PREREQUISITES TO A CLASS ACTION

One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.

Pa.R.Civ.P. 1702.

¶ 4 Rule 1708 affords guidance to the trial court, as it exercises the broad discretion granted to it, in determining whether a class action would, in fact, be a fair and efficient method of resolution of the controversy. The Rule provides, in relevant part:

### RULE 1708. CRITERIA FOR CERTIFICATION. DETERMINATION OF CLASS ACTION AS FAIR AND EFFICIENT METHOD OF ADJUDICATION

In determining whether a class action is a fair and efficient method of adjudicating the controversy, the court shall con-

---

**25.** As the majority aptly recounts, the Federal Trade Commission in 1974 concluded that a Sun advertising campaign had been "unfair and deceptive". As a result, Sun entered into a consent decree that required Sun to cease and desist from "misrepresenting, in any manner, performance characteristics of Sunoco gasoline...." Nonetheless, Sun in 1990 undertook a campaign which resembled that prior "deceptive" campaign. This latter Sun effort underlies the instant action.

sider among other matters the criteria set forth in subdivisions (a),(b) and (c).

(a) Where monetary recovery alone is sought, the court shall consider

**(1) whether common questions of law or fact predominate over any question affecting only individual members;**

**(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;**

(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

(i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatible standards of conduct;

(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action.

Pa.R.Civ.P. 1708(a) (emphasis supplied).

¶ 5 The trial court's findings of fact, which enjoy substantial evidentiary support in the record and thus may not be disturbed by this Court, include:

1. Defendants are Pennsylvania Corporations engaged in the manufacture, sale and advertising of Sunoco Ultra gasolines to consumers.

2. Defendants manufacture only two "base grades" of gasoline: "Economy" with a minimum of 86 octane; and "Ultra" with a minimum of either 93.5 or 94 octane.

3. These "base grades" are distributed to Sunoco franchises and blended at each pump to create intermediate grades of gasoline, typically rated at 87, 89 and 92 minimum octane.

4. "Octane" is an index number that measures a fuel's resistance to engine knock. An automobile's octane requirement is the recommended fuel octane that car requires to avoid engine knock.[26]

5. During the class period, defendants supplied gasoline to approximately 4,455 Sunoco retail stations in twenty-three states, including approximately 647 stations in Pennsylvania.

6. Each year during the class period Sunoco retail stations sold between 750 million and 960 million total gallons of Ultra 93.5 and 94 gasoline, an amount approximately equal to 15% of total Sunoco gasoline sales.

7. During the class period, Ultra 93.5 and 94 gasolines were typically priced at least fifteen cents higher per gallon than non-premium grades of gasoline.

---

26. Webster's New Collegiate Dictionary provides the following definitions:

octane 1: any of several isomeric liquid paraffin hydrocarbons $C_8H_{18}$ 2: octane number

octane number: a number that is used to measure the anti-knock properties of a liquid motor fuel and that represents the percentage by volume of isooctane in a reference fuel consisting of a mixture of isooctane and normal heptane and matching in knocking properties the fuel being tested – called also *octane rating;* compare cetane number.

**1174**

8. During the class period, defendants promoted their Ultra gasolines with both radio and television advertising campaigns in the media markets where their franchises were located.

9. Some of the defendants' advertisements for Sunoco Ultra during the class period suggested that Ultra-grade gasolines would provide cars with superior engine performance as a result of their high octane content.

10. Plaintiff Weinberg is a citizen of Pennsylvania who purchased Sunoco Ultra gasoline in Pennsylvania for personal or family use from 1990 to 1992.

11. While plaintiff Weinberg saw and heard advertisements for Sunoco Ultra gasolines during the class period, he does not now recall the content of any specific advertisement.

12. Plaintiff Weinberg did not rely on any specific assertion made in those advertisements when deciding to purchase Ultra gasoline during the class period.

13. Plaintiff Weinberg's decision to purchase Ultra gasoline was based mainly on his general perception and belief that it was the best gasoline available.

14. Plaintiff Guarino is a citizen of New Jersey who purchased Sunoco Ultra gasoline in Pennsylvania for personal or family use from 1990 to 1992.

15. Plaintiff Guarino saw and heard advertisements for Sunoco Ultra gasoline during the class period.

16. Plaintiff Guarino purchased Ultra gasoline during the class period, relying on assertions in defendants' advertisements that it would enable her car to achieve superior engine power, acceleration and performance.

17. Plaintiff Gordon is a citizen of Pennsylvania who purchased Sunoco Ultra gasoline in Pennsylvania for personal or family use from 1990 to 1992.

18. Plaintiff Gordon saw and heard advertisements for Sunoco Ultra gasoline during the class period.

19. Plaintiff Gordon purchased Ultra gasoline during the class period, relying on assertions in defendants' advertisements that it would enable his cars to achieve superior engine power, acceleration and performance.

20. Plaintiffs' amended complaint asserts five claims: 1) that defendants made false and deceptive representations to plaintiffs, violating Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("CPL"), 73 P.S. §§ 201-1, et seq.; 2) that defendants fraudulently induced plaintiffs to purchase Ultra-grade gasoline in violation of Common Law Fraud principles; 3) that defendants negligently misrepresented the characteristics of Ultra gasoline; 4) that defendants' improper actions constituted a breach of an express warranty created by their claims about Ultra gasoline; and 5) that defendants have been unjustly enriched by the practices set forth above.

21. Plaintiffs' suit has been filed as a class action on behalf of the following proposed class:

All persons in the United States who purchased Sunoco Ultra 93.5 and 94 gasoline for personal, family or household purposes from February 22, 1990 through May 6, 1992. Excluded from the class are defendants Sun Company, Inc. and Sun Company, Inc. (R & M) and defendants' officers and directors.

¶ 6 My review of the record suggests that certification of the class proposed by appellants [27] would have constituted an abuse of discretion by the learned trial court judge. In this case, just as in *Hanson*, the sole fact common to all of the proposed class members is the purchase of Sunoco Ultra gasoline. "The remaining questions of fact and law are unique to each person's circumstances, to wit, [whether the pur-

27. I agree with the conclusion of the majority that the Pennsylvania Rules of Civil Procedure permit certification of a national class action.

chase was for personal or family use as opposed to business use, whether the class member read or heard the offending advertisements and as a result of those specific misrepresentations by appellee [28], purchased Sunoco Ultra, whether the class member owned a car which could not benefit from increased octane [29], the amount of each class member's damages, the state consumer fraud statute of the class member's home state, the requirements and remedies of that statute, etc.]". *Hanson v. Federal Signal Corp., supra,* 679 A.2d at 789.

> ...While the existence of individual questions of fact is not necessarily fatal, it is essential that there be a **predominance** of common issues, shared by all the class members, which can be justly resolved in a single proceeding. *Hayes,* 370 Pa.Super. at 606, 537 A.2d at 332. In determining **liability,** this court has stated that "the common question of fact" means precisely that – the facts surrounding each plaintiff's claim must be substantially the same so that proof as to one claimant would be proof as to all. *Allegheny County Housing Authority v. Berry,* 338 Pa.Super. 338, 341, 487 A.2d 995, 997 (1985).
> There is a significant difference, however, between individual factual questions regarding **damages** and individual questions of fact concerning **liability.** *Cook v. Highland Water & Sewer Authority,* 108 Pa.Cmwlth. 222, 231, 530 A.2d 499, 504 (1987). Once a common source of liability has been clearly identified, varying amounts of **damages** among the

plaintiffs will not preclude class certification. *Id.* "However, where there exist various intervening and possibly superseding causes of damage, liability cannot be determined on a class-wide basis."

*Weismer v. Beech–Nut Nutrition Corp., supra,* 615 A.2d at 431 (emphasis in original).

¶ 7 Recently, this Court in *Basile v. H & R Block Eastern Tax Services, Inc.,* 729 A.2d 574 (Pa.Super.1999), agreed with

> Judge Herron's conclusion that the UTPCPL requires a showing of detrimental reliance in private actions based on all provisions of the statute. *See:* 73 P.S. § 201–9.2. *See also: DiLucido, supra,* at 1241. Additionally, we recognize that an action under the UTPCPL may not be amenable to class certification due to discrepancies in the respective levels of reliance displayed by individual class members.

*Basile, supra,* 729 A.2d at 584.

¶ 8 The requirement of detrimental reliance for a private cause of action under the UTPCPL would appear to generally preclude certification of a class action [30], since such a requirement almost insures that individual factual issues will predominate over common questions of law or fact. *See, e.g.: Amchem Products Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)(the commonality of asbestos exposure shared by the proposed class members was insufficient to satisfy the predominance requirement of

---

**28.** Contrary to the conclusion of the majority, I remain convinced that "the UTPCPL requires a showing of detrimental reliance in private actions based on **all** provisions of the statute." *Basile v. H & R Block Eastern Tax Services, Inc.,* 729 A.2d 574, 584 (Pa.Super.1999)(emphasis supplied). *Accord: Fay v. Erie Insurance Group,* 723 A.2d 712, 714 (Pa.Super.1999); *DiLucido v. Terminix International Inc., supra,* 676 A.2d at 1241.

**29.** The parties agree that a small percentage of cars do require or will benefit from high octane gas.

**30.** The reliance of the majority upon the decision of the Commonwealth Court in *Commonwealth v. Hush–Tone,* 4 Pa.Cmwlth. 1 (1971), is not here appropriate, in my view, since the instant case is a **private** action for money damages under Section 201–9.2(a) of the Act, and not an **enforcement action** brought under Section 201–4 by the Attorney General of the Commonwealth of Pennsylvania or a county district attorney.

F.R.C.P. 23(b)(3) where numerous individual issues existed, differences which were compounded by differences in the applicable state laws); *Carpenter v. BMW of North America, Inc.*, 1999 WL 415390 (1999 U.S. Dist. Lexis 9272)(E.D.Pa.1999)(denial of class certification of claims against BMW of North America, Inc. based upon consumer fraud statutes, common law fraud, negligent misrepresentation and breach of contract due to inability of class to meet predominance requirement where the consumer protection laws of each state varied, and individual issues of knowledge and reliance overwhelmed the commonality element).

¶ 9 Thus it is that I would affirm the order which denied certification of the proposed class.

