## Hannis v. Sacred Heart Hospital

C.P. of Lehigh County, no. 1996-C-0965.

*Robert G. Bauer,* for plaintiffs.

*Georgine A. Olexa,* for defendant Sacred Heart Hospital.

*Christopher A. Stump,* for defendant Rios.

GARDNER, *P.J.*, June 20, 2000—This matter is before the court on plaintiffs' motion for certification of class action which was filed September 17, 1997. Defendant Sacred Heart Hospital filed its response on behalf of defendant Sacred Heart Hospital to plaintiffs' motion for certification of class action on October 1, 1997.[1] After the parties completed extensive discovery, class certification hearings were held on November 24, 1998 and February 1 and 5, 1999. The matter was briefed, and closing arguments were heard on February 2, 2000. For the reasons expressed below, we grant plaintiffs' motion for certification of class action.

Plaintiffs brought this action in negligence and professional negligence against defendant Nestor Rios M.D., a pediatrician, and defendant hospital which employed him. Plaintiffs allege that Dr. Rios treated them, or had other contact with them, at a time when he knew, or should have known, that he had infectious tuberculosis, without advising them of his condition or taking other precautions to protect them from exposure to the disease.

Plaintiffs allege that some of the numerous people who were exposed to Dr. Rios either contracted tuberculosis, or were required to undergo prophylactic antibiotic treatment as a result of their exposure. Plaintiffs also contend that the hospital permitted Dr. Rios to treat them, and failed to warn them or protect them, when it knew, or should have known, that Dr. Rios had infectious tuberculosis.

------

1. Defendant Dr. Nestor Rios did not file an answer to plaintiffs' motion for certification of class action. He only filed a brief in opposition.

## FINDINGS OF FACT

Based on the pleadings, record papers, stipulations, depositions, testimony, exhibits and agreements of counsel, the pertinent facts are as follows. Defendant Rios worked as a pediatrician at the Sacred Heart Hospital Clinic from approximately July 1995 until January 28, 1996. Dr. Rios allegedly suffers from asthma.

In early November 1995, Dr. Rios received a flu shot, after which he experienced flu-like symptoms for three or four days. Dr. Rios testified that he felt fine after recovering from those symptoms in November 1995, until late January 1996, when he developed a productive cough. He testified that this cough was different from the asthmatic cough which he generally experienced.

On January 28, 1996, Dr. Rios started to feel badly. His symptoms included a productive cough, chills, wheezing and a temperature of 101 degrees. Dr. Rios decided not to go to work. He prescribed for himself an antibiotic known as Biaxin. Dr. Rios did not return to work at the clinic after January 28, 1996.

Because he did not feel better after a few days out of work, Dr. Rios sought treatment from a Dr. Garcia. On February 6, 1996, Dr. Rios underwent a Mantoux Tuberculin skin test to which he had a positive reaction. On February 8, 1996, a sputum culture was reported as positive for mycobacterium tuberculosis.

The Allentown Health Bureau is responsible for investigating all communicable diseases in the vicinity. On February 21, 1996, it received a report that Dr. Rios had infectious tuberculosis. Upon receiving the report that Dr. Rios had an active case of tuberculosis, the bureau

conducted an investigation to determine who may have been exposed to him while he was exhibiting tuberculosis symptoms, so that those persons could be notified and tested.

Children are more susceptible than adults to the bacterium of tuberculosis. Accordingly, because Dr. Rios was a pediatrician, the bureau was most concerned with identifying child patients to be tested. The bureau also attempted to identify people such as co-workers, family members and social acquaintances with whom Dr. Rios may have had close contact.

As a result of its investigation, the bureau established the period of possible infectiousness for Dr. Rios as November 1, 1995 to February 21, 1996.[2] In establishing these dates, the bureau expanded the period of possible infectiousness in order to err on the side of safety. The bureau identified 1,416 pediatric patients and 576 other persons as having been potentially exposed to Dr. Rios. Also, 31 co-workers and 11 social, or family, contacts of the doctor were identified.

Because a valid test for tuberculosis cannot be obtained from a child under six months of age, the bureau recommended that all potentially exposed children in that category go on a course of anti-tuberculosis medication. Two hundred and twenty children were started on this medication. In addition, 57 adults were treated with antibiotics.

---

2. In defining the parameters of the class we have adopted the period established by the Allentown Health Bureau as the period during which Dr. Rios was infected with active tuberculosis because plaintiffs have the burden of proof on this issue, and they did not provide any evidence or argument to dispute, refute or modify the bureau definition of the period of infectiousness.

## PROPOSED CLASS

In their motion for certification of class action, plaintiffs originally sought class certification for a group of over 1,300 persons. These persons included minors, parents of minors and adults who were similarly situated in that they may have been exposed to, or come in contact with, or were in proximity with, defendant Dr. Rios at a time when he was infected with active tuberculosis. These contacts occurred at defendant hospital, the clinic, or elsewhere. Some of these persons either contracted tuberculosis, or were required to undergo prophylactic antibiotic treatment, as a result of their exposure to Dr. Rios. Finally, some of them sustained damages as a result of their tuberculosis or as a result of their treatment.

At closing argument and in plaintiffs' supplemental brief in support of class action certification dated February 1, 2000, plaintiffs further limited their request for class certification to the 277 individuals who allegedly received antibiotic treatment as a result of possibly being exposed to Dr. Rios.[3]

## CLASS REPRESENTATIVES

Plaintiffs request that the 11 adult plaintiffs be designated as class representatives to pursue the class action on behalf of all members of the class. These proposed class representatives are plaintiffs Randy Hannis, Dawn Hannis, Robert Kline, Gina Kline, Luis Rodriguez, Elizabeth Rodriguez, Harold Rockman, Trinette Kraftician, Lisa Kozero, Claudette Jenson and Valerie Santiago.

---

3. As noted above, 220 children and 57 adults were treated with antibiotics.

## DISCUSSION

The appellate courts have established that decisions in favor of maintaining a class action should be liberally made. *Weinberg v. Sun Company Inc.,* 740 A.2d 1152, 1162 (Pa. Super. 1999). This is because "the class action is an important social device that makes possible the effective assertion of many claims that otherwise might not be litigated." *Bell v. Beneficial Consumer Discount Co.,* 241 Pa. Super. 192, 205, 360 A.2d 681, 688 (1976). (footnote omitted)

Pennsylvania Rule of Civil Procedure 1702 enumerates the prerequisites for a class action. The rule provides:

"Rule 1702. Prerequisites to a class action

"One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if

"(1) the class is so numerous that joinder of all members is impracticable;

"(2) there are questions of law or fact common to the class;

"(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

"(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708."

The burden of proof in a class certification proceeding is upon the party seeking certification. To meet this burden, the party seeking certification must present evi-

dence of the underlying facts sufficient to show that each of the requirements is satisfied. *Weinberg,* 740 A.2d at 1162. For the following reasons, we conclude that plaintiffs have sustained their burden of establishing the five prerequisites to the certification of a class action. We will address each class action requirement separately.

## NUMEROSITY

To satisfy the numerosity requirement, plaintiffs must prove that the class or each subclass is so numerous that joinder of all members is impracticable. Pa.R.C.P. 1702(1); *Weinberg,* 740 A.2d at 1165. The requisite number of class members needed to meet the numerosity requirement depends on the particular circumstances of each case. However, plaintiffs need only define the class with "some precision" in presenting the court with evidence that the number of members of the potential class renders joinder impracticable. *Janicik v. Prudential Insurance Co. of America,* 305 Pa. Super. 120, 132, 451 A.2d 451, 456 (1982).

As noted, plaintiffs contend that the proposed class is a group of 277 individuals who received antibiotic treatment because they were identified as possibly being exposed to Dr. Rios while he was infected with tuberculosis. According to plaintiffs, this class consists of 220 children and 57 adults who suffered side effects from the antibiotic treatment.

Defendants contend that the bureau received only three complaints of adverse side effects from the antibiotic treatments. Therefore, defendants assert that plaintiffs have failed to show that there are sufficient persons who suffered adverse side effects to satisfy the numerosity requirements.

Moreover, defendants contend that according to Dr. Lee B. Reichman M.D., M.P.H., who is board certified in internal medicine, and an expert in tuberculosis, infants do not suffer adverse side effects from tuberculosis treatments. Even if the infants did suffer some adverse effects, defendants contend, the alleged side effects are common ailments to children. Therefore, to determine whether the alleged side effects were the result of the medication or some ailment common to children, will require a case-by-case analysis of each plaintiffs' damages. We disagree.

Based on the evidence presented at the class certification hearing, we find that plaintiffs have satisfied the numerosity requirement. While plaintiffs originally requested certification of a class of 1,300 persons with vastly different claims, they subsequently requested certification of a smaller class of 277 persons with similar claims.

We find that these 277 persons can be divided into two subclasses. The first subclass consists of children and their parents who were seen or treated by Dr. Rios in the hospital or clinic, were notified that they may have been exposed to tuberculosis, received treatment, and may have suffered side effects from the treatment. The second subclass is a group of children and adults who did not receive treatment from Dr. Rios, but were notified that they may have been exposed to tuberculosis, obtained treatment for the possible exposure, and suffered side effects from the treatment.

Defendants' contention that only three persons were identified by the bureau as suffering side effects ignores the testimony of Dawn Hannis and Lisa Kozero. These

two proposed class representatives testified that their children suffered side effects which they never reported to the bureau.

We conclude that there is sufficient evidence in the record to suggest that further discovery may lead to others in the proposed class who suffered adverse side effects from the antibiotic treatments. Moreover, defendants' claim that the side effects are attributable to something other than the treatments is an issue to be determined by the fact-finder at trial.

## COMMONALITY

To satisfy the commonality requirement, plaintiffs must prove that there are questions of law or fact common to the class. Pa.R.C.P. 1702(2). Concerning the requirement of commonality, the class representatives must demonstrate a predominance of common issues shared by all class members. A predominance of common issues exists only if the facts underlying each plaintiff's claim are sufficiently similar so that proof as to one plaintiff would be proof as to all. *Weismer v. Beech-Nut Nutrition Corp.*, 419 Pa. Super. 403, 408-409, 615 A.2d 428, 431 (1992).

"The trial court is vested with broad discretion in determining the definition of the class as based on commonality of issues and the propriety of maintaining the action on behalf of the class." The appellate courts "may not disturb the trial court's order 'unless the [trial] court neglected to consider the requirements of the rules [of civil procedure] or abused its discretion in applying them.' " *Hanson v. Federal Signal Corporation,* 451 Pa. Super. 260, 266-67, 679 A.2d 785, 788 (1996).

Plaintiffs contend that there are common issues of liability in this case. Specifically, the claim of each class member stems from his or her identification by the Allentown Health Bureau as having come in contact with Dr. Rios while he was infected with tuberculosis. Also common to each class member is the claim that Dr. Rios continued to see patients while infected, and that his hospital employer negligently failed to monitor him. Finally, common to each class member is their assertion that they each received antibiotic treatment as a result of possibly being exposed to Dr. Rios.

Defendants contend that each class member has different issues of causation and damages. Defendants contend that each class member's claim is predicated on the allegation that the prophylactic treatment caused adverse side effects. As a result, in order to state a cognizable claim, each class member must prove both that he or she suffered adverse side effects, and that the treatment was the cause of those side effects.

We agree with plaintiffs that they have satisfied the commonality requirement because there are questions of law and fact common to the class. This case is analogous to *Floyd v. City of Philadelphia,* 1 Phila. 268 (1978), relied upon by plaintiffs.

In *Floyd,* 194 people were exposed to toxic chlorine gas as a result of a leak at a Philadelphia city facility. The alleged personal injuries ranged from temporary nausea to severe respiratory problems. However, the majority of the class suffered only slight nausea and discomfort. There were only seven plaintiffs who alleged severe injury or aggravation of pre-existing conditions. The *Floyd* court held that there was a common question

of fact which predominated over all others, that is, how the leak of the harmful gas occurred and who was at fault.

The *Floyd* case and the case before this court are analogous. In both cases a large number of people were exposed to a single dangerous condition. In the within case, we have the alleged exposure of 277 people to the contagious tuberculosis of Dr. Rios, a disease, and a claim that plaintiffs suffered from side effects from the antibiotics administered to combat the disease. In *Floyd,* we have the alleged exposure of 194 people to the toxic chlorine gas which leaked from the city facility, and a claim that plaintiffs became sick from chemical exposure. The cases are further similar in that in each case the plaintiffs must prove that they were exposed to the condition, the condition was dangerous, the condition (or treatment) made them sick, and who was at fault.

Further, the *Floyd* court found that the damage claims might have to be dealt with on an individual basis. The damages in *Floyd* are analogous to the alleged damages in the present case. In both cases, a few plaintiffs reported severe effects from the exposure, and a majority reported milder symptoms. There are similarities to the symptoms and side effects experienced in each class, but some details of each class member's condition may differ. The *Floyd* court correctly noted that the need for special handling of the damages phase does not justify denying certification of the class.

In the within case, the majority of the damage claims are likely to be of the variety described by Dawn Hannis and Lisa Kozero. These witnesses described side effects of the antibiotics. Dawn Hannis testified that her daugh-

ter suffered from diarrhea, discoloration of stool, loss of appetite, and that her daughter was more irritable than usual.

Lisa Kozero testified that her son seemed more irritable than a newborn should be and that he cried all the time while on the antibiotics. Her assessment of what is normal for a newborn was based on her experience in rearing her sister.

With the exception of the three more serious cases which were reported to the bureau,[4] the adverse effects suffered by other children are presumably similar to those reported by Dawn Hannis and Lisa Kozero. It is possible that there may be other parents who did not report to the bureau what could be considered mild side effects of the antibiotics.

---

4. Paula Margraf, clinical services manager at the Allentown Health Bureau, testified that one person reported a serious hepatic side effect while on the prescribed antibiotic treatment. That condition improved when the medication was stopped. Mrs. Margraf further testified that the common complaints of the other persons who reported side effects to the bureau were gastrointestinal upset, diarrhea, loss of appetite, vomiting and occasional rash. Notes of Testimony of the testimony of Paula Margraf at the hearing held February 1, 1999, p. 113.

The anti-tuberculosis medication administered to those persons who were exposed to Dr. Rios included the antibiotics Rifampin and Isoniazid, INH. Mrs. Margraf also testified that common side effects of Rifampin and INH include fatigue, loss of appetite, nausea, vomiting, change in bowel habits, white or light-colored stools, rash, and, at a later date, hepatic symptoms such as jaundice, yellow eyeballs, yellow skin, and skin turning orange. Additional common side effects of INH include fever and tea-colored urine. N.T. 112.

Finally, Mrs. Margraf testified that of the people who called the bureau reporting adverse reactions to either drug, three persons were taken off of the medication on the recommendation of the bureau. N.T. 115-16.

Further, we would expect that if more serious side effects were present in other children, that they probably would have been reported to the bureau. Accordingly, we believe that class discovery will reveal the severity of the side effects in each plaintiff's case. But it is fair to assume that the majority of symptoms will be of the type described by the proposed class representatives, rather than the type of more serious symptoms reported to the bureau in the three more serious cases.

Defendants rely on *Hanson v. Federal Signal Corporation, supra,* to support their contention that the commonality requirement has not been satisfied. However, their reliance is misplaced.

In *Hanson,* eight Philadelphia firefighters filed a complaint against the manufacturer and distributors of sirens used by the Philadelphia Fire Department. They sought damages and injunctive relief based on alleged hearing loss suffered as a result of defective sirens. They sought to have their cases certified as a class action on behalf of all persons who, while serving as firefighters in the Philadelphia Fire Department, had been exposed to noise emitted from sirens manufactured or distributed by defendants and who had sustained permanent noise-induced hearing loss.

The trial judge, Honorable Bernard J. Avellino, found that plaintiffs had satisfied the first four requirements of a class action under Rule 1702, including the commonality requirement of Rule 1702(2). In support of his conclusion that there were questions of law or fact common to the class, Judge Avellino stated, "[A]ll these folks are firefighters, all of them have been exposed to occupational noises which at least arguably went beyond those

that they should be exposed to." *Id.,* 451 Pa. Super. at 268, 679 A.2d at 789. The trial court was affirmed by the Superior Court of Pennsylvania in *Hanson.*

Accordingly, in this context,[5] *Hanson* provides support for the conclusion that plaintiffs in the within case have satisfied the commonality requirement. *Hanson, Floyd* and the within case are all analogous to the extent that, in each case, a large group was exposed to a dangerous condition (tuberculosis, toxic chlorine gas, and excessively loud sirens), and allegedly suffered damages as a result, and in each case the courts concluded that those similarities satisfied the commonality requirements of Rule 1702(2).

Therefore, we agree with plaintiffs that there are common issues of law and fact which outweigh the individual questions in this case. Defendants' arguments in this regard are focused on the level of damages that each plaintiff will have to prove. In a class action, damages will almost always have to be proven on an individual basis. In that respect this case is no different from any class action.

---

5. While the trial judge in *Hanson* found that plaintiffs satisfied the commonality requirement of Pa.R.C.P. 1702(2), he concluded that plaintiffs did not satisfy the fifth requirement of a class action under Rule 1702(5). Specifically, he concluded that the class action did not provide a fair and efficient method for adjudication of the controversy under the criteria set forth in Pa.R.C.P. 1708. Rule 1708(a)(1) states, "(a) Where monetary recovery alone is sought, the court shall consider (1) whether common questions of law or fact predominate over any question affecting only individual members." He concluded that the individual questions predominated over the common questions in the area of damages. Therefore, this concept is more appropriately addressed below in the section on fair and efficient resolution, and the subsection on predominance of common questions of law or fact.

Defendant hospital contends that Dr. Rios' medical condition would not have been constant throughout the entire period between November 1, 1995 and February 6, 1996. Defendant further contends that in order for it to be held liable for corporate negligence, it is necessary for plaintiffs to show that it had actual or constructive knowledge of the condition of Dr. Rios. See *Thompson v. Nason Hospital*, 527 Pa. 330, 591 A.2d 703 (1991).

The hospital defendant further asserts that because each plaintiff who saw Dr. Rios did so at different times, the state of knowledge of the administrators at Sacred Heart Hospital differs as to each plaintiff. Therefore, defendant hospital argues that the applicable standard of care will differ depending upon when the hospital knew or should have known about the condition of Dr. Rios.

Defendant hospital's contention that the class should not be certified because there are liability issues personal to each plaintiff is without merit. Ultimately, the jury will decide what the hospital knew, should have known, and when, or if, it should have acted in this matter. At this stage of the proceedings it is impossible to determine whether or not all of the details concerning liability will be identical for each class member, or whether there will be factual differences which would result in two or three subclasses, or whether the differences will be so widespread that a number of potential class members will not fit into any class or subclass description.

For example, if the jury were to conclude that by November 1, 1995 the hospital knew, or should have known, that Dr. Rios had infectious tuberculosis and took no steps to remove him from contact with patients, and did nothing to warn or protect those who might come in contact

with him, each of the 277 class members would be in a single, common liability class under those circumstances. If, on the other hand, the hospital learned certain things about the condition of Dr. Rios in two or three stages thereafter, the class members could be grouped into two or three subclasses for liability purposes, depending upon the details. However, for the reasons expressed above, there is a sufficient predominance of common liability and damages issues shared by the class to permit the matter to proceed through the discovery stage as a class action.

However, upon completion of class discovery, the facts developed in discovery may reveal that it would be appropriate to designate subclasses. Or the facts may reveal that summary judgment or decertification of all, or part, of the class may be appropriate. If so, defendants may file a motion for summary judgment, or partial summary judgment, or a motion for class decertification, or partial decertification, at that time.

## TYPICALITY

To satisfy the typicality requirement, plaintiffs must prove that the claims or defenses of the representative parties are typical of the claims or defenses of the class. Pa.R.C.P. 1702(3). For plaintiffs to satisfy their burden regarding typicality, the overall position of the class representatives must be sufficiently aligned with that of the absent class members to insure that the pursuit of the representatives' own interests will advance those of the proposed class members. *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 676 A.2d 1237 (1996).

Defendants contend that the diverse issues of causation involved in this case preclude a finding that plaintiffs have satisfied their burden of proof as to the typicality requirement. Moreover, defendants contend that the proposed representative plaintiffs are not appropriate class representatives.

On the other hand, plaintiffs contend that the testimony of plaintiffs Dawn Hannis, Lisa Kozero and Harold Rockman, and the other evidence, establishes that each of the 11 proposed class representatives is sufficiently aligned with the absent class members to appropriately represent the class interests. We agree in part, and disagree in part, with plaintiffs.

For purposes of typicality, there may be two distinct subgroups in this class action. First, there is a subgroup of persons who either received treatment from, or had personal contact with, Dr. Rios at a time when he was infectious. The second subclass includes persons who did not treat with Dr. Rios, or have direct contact with him, but who may have been at the hospital or clinic at a time when Dr. Rios was infectious and was present there. The persons in each of these subgroups received notification from the bureau that they or their children may have been exposed to tuberculosis, and they sought and received the antibiotic treatment which was recommended by the bureau.

Plaintiffs Luis Rodriguez and Elizabeth Rodriguez are the parents of Catalina Rodriguez. Plaintiff Trinette Kraftician is the mother of Briana Kraftician. Plaintiff Valerie Santiago is the mother of Elijah Holmes Santiago. At his deposition, Dr. Rios testified that on August 14, 1995 he treated Catalina Rodriguez for breath-holding

spells at the clinic. He also testified that Catalina Rodriguez was seen by Dr. Rice, the senior resident on October 30, 1995 in the clinic.[6]

Dr. Rios also testified that on November 6 and December 6, 1995 he treated Briana Kraftician for excessive crying and diarrhea at the clinic.[7] Finally, Dr. Rios testified that on November 25, 1995 he performed an admitting physical on Elijah Santiago at the hospital and later authorized his discharge.[8] Accordingly, we find that Trinette Kraftician and Valerie Santiago, as parents and natural guardians of their respective children, are proper representatives of the first subclass, because their claims are typical of the claims of the members of that subclass.

However, we find that Luis Rodriguez and Elizabeth Rodriguez, as parents and natural guardians of their child, Catalina Rodriguez, are not proper representatives of either subclass. They are not proper members of the first subclass because there is no indication in the record that Catalina Rodriguez had any direct contact with Dr. Rios on any date other than August 14, 1995, which is prior to the November 1, 1995 commencement of the period of infectiousness.[9] Similarly, they are not proper members of the second subclass because there is no indication in the record that Catalina Rodriguez had any indi-

---

6. Deposition of Dr. Nestor Rios, November 20, 1998, N.T., pp. 93-94.

7. N.T. 97-101.

8. N.T. 104-105.

9. As previously noted, the bureau set the period of infectiousness of Dr. Rios as between November 1, 1995 and February 21, 1996. The only direct or indirect contact that Catalina Rodriguez had with Dr. Rios occurred before November 1, 1995.

rect contact with Dr. Rios on any date other than October 30, 1995, which is also prior to the onset of infectiousness.[10] Therefore, Catalina's claims are not typical of the claims of the members of either subclass.

Plaintiffs Randy Hannis, Dawn Hannis and Lisa Kozero are parents of infants who underwent treatment with anti-tuberculosis medication and suffered side effects. Randy Hannis and Dawn Hannis are the parents of Devyn Hannis. Mrs. Hannis testified that in mid-March 1996, the bureau notified her that Devyn, then 3 months old, may have been exposed to Dr. Rios while the doctor was exhibiting tuberculosis because he was on call at the hospital between December 26 and 28, 1995, during which time Devyn was born.

Because there is no valid tuberculosis test for a child of this age, the bureau recommended that Devyn undergo a course of anti-tuberculosis medication. Therefore, from mid-March 1996 to mid-April 1996, Devyn received the antibiotic Rifampin orally. From mid-April 1996 until May 10, 1996, Devyn received the antibiotic Isoniazid, INH, orally. Mrs. Hannis further testified that Devyn suffered the side effects of diarrhea, discoloration of stool and loss of appetite. Mrs. Hannis also testified that for the entire period her daughter was taking the INH medication, the child was more irritable than usual from the medication.

---

10. Nothing contained in this opinion should be construed as precluding Catalina Rodriguez, or any other potential class member, from inclusion as a member of the class, or any subclass which may be designated, if class discovery uncovers any information which would qualify her for class, or subclass, membership.

Plaintiff Lisa Kozero is the mother of Joseph A. Kozero. Mrs. Kozero testified that in late February 1996, the bureau notified her that Joseph, then less than 3 months old, may have been similarly exposed to Dr. Rios because he was on call during the time when Joseph was born at defendant hospital.

Accordingly, for approximately seven months, Joseph underwent a recommended course of anti-tuberculosis medication. From March 1996 to June or July 1996, Joseph received oral doses of Rifampin. In June or July, Joseph was switched to INH for two or three more months. Lisa Kozero further testified that her son cried excessively for a newborn while on the INH, and may have also exhibited a loss of appetite. Also, Mrs. Kozero testified that she took her son off the medication because it was difficult to administer and because he had been taking it a long time.

Plaintiffs Robert Kline and Gina Kline are the parents of Mason Kline. Mason was delivered at the hospital on November 16, 1995 by Dr. John P. Hentosh.[11] Mason was apparently not a patient of Dr. Rios. However, Mason may have been exposed to Dr. Rios, who was allegedly present at the pediatric ward of the hospital on November 16 and 17, 1995 when Mason and his mother were patients there.[12]

We agree with plaintiffs that Dawn Hannis and Randy Hannis, on behalf of their daughter Devyn; and Lisa Kozero, on behalf of her son Joseph; and Robert Kline and Gina Kline, on behalf of their son Mason, are each

---

11. See defendant Rios exhibit 1-B.

12. See plaintiff Kline's response to interrogatory 27 propounded by defendant Rios.

proper class representatives of the second subclass. Their claims are typical of the claims of the members of the second subclass.

However, we disagree with plaintiffs that plaintiff Harold Rockman is an appropriate class representative. Plaintiffs contend that Mr. Rockman is representative of the persons who encountered Dr. Rios outside of the hospital or clinic.

Harold Rockman was a neighbor of Dr. Rios. Mr. Rockman and Dr. Rios came in contact almost on a daily basis. They lived directly across the hall from each other in the same apartment complex. They would go to work at about the same time and would leave the building at about the same time. They saw each other in the laundry room on two occasions. Occasionally, Dr. Rios came to Mr. Rockman's door. Dr. Rios was inside Mr. Rockman's apartment once, and Mr. Rockman was inside Dr. Rios' apartment once.[13]

Mr. Rockman was not advised by the bureau about his possible exposure to tuberculosis. Rather, he was advised about Dr. Rios' condition by a newspaper reporter who attempted to interview him. The reporter suggested that Mr. Rockman might want to consider being tested.

Mr. Rockman tested positive for tuberculosis. Mr. Rockman was given the antibiotic treatment and now claims that he suffers from a permanent orthopedic injury from the medication.

Because no other member of the class identified thus far has similar circumstances, we find that the claims of Mr. Rockman are not typical of any other class mem-

---

13. Notes of Testimony of the testimony of Harold Rockman at the hearing held February 5, 1999, p. 80.

bers. Accordingly, we do not find him, or his claims, to be representative of the rest of the class.

Plaintiff Claudette Jenson allegedly tested positive for tuberculosis. However, she was never a patient of Dr. Rios. She allegedly had personal contact with Dr. Rios while he was treating her son, Jeffrey Achey, at the clinic.[14] However, it is unclear from the record whether she ever was notified by the bureau or received antibiotic treatments.

Accordingly, we find that while discovery might lead to her inclusion in the first subclass, it is not appropriate to include her as a class representative on the limited record before the court at this time. However, we are not precluding her inclusion as a potential class member.

Therefore, for the foregoing reasons, we find that plaintiffs have satisfied the typicality requirement in part.

## REPRESENTATIVE PARTIES

To satisfy the representative parties requirement, plaintiffs must prove that the class representatives will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709. Pa.R.C.P. 1708(4). Pennsylvania Rule of Civil Procedure 1709 specifies three requirements of fair and adequate representation. The rule provides:

"Rule 1703. Criteria for certification. Determination of fair and adequate representation

---

14. See plaintiff Claudette Jenson's response to interrogatory 27 propounded by defendant Rios.

"In determining whether the representative parties will fairly and adequately assert and protect the interests of the class, the court shall consider among other matters

"(1) whether the attorney for the representative parties will adequately represent the interests of the class,

"(2) whether the representative parties have a conflict of interest in the maintenance of the class action, and

"(3) whether the representative parties have or can acquire adequate financial resources to assure that the interests of the class will not be harmed."

Unless the class opponent demonstrates otherwise, and in the absence of proof to the contrary, there is a legal presumption that the representative parties will fairly and adequately protect the interests of the class members. *Janicik, supra.*

In this case, defendants do not dispute that the prospective class representatives will fairly and adequately represent the class. They do not contend that the class representatives have any conflicts of interest. Nor do defendants take issue with the professional qualifications of plaintiffs' counsel or his ability to advance the resources necessary to fund this litigation.

Accordingly, we conclude that the class representatives have no conflict of interest and can fairly and adequately represent the class. Plaintiffs' counsel has advised the court that he will advance the costs of this litigation for the members of the class.

We know plaintiffs' counsel to be an attorney of good reputation in the legal community. We presume that his firm has the financial resources to more than adequately represent the interests of the class.

Therefore, we find that plaintiffs have satisfied the three-prong test to satisfy the fourth requirement of class certification.

## FAIR AND EFFICIENT RESOLUTION

To satisfy the final requirement for class certification, plaintiffs must prove that a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708. Pa.R.C.P. 1702(5). Pennsylvania Rule of Civil Procedure 1708(a) sets forth the criteria for making that determination. Rule 1708(a) provides, in part:

"(a) Where monetary recovery alone is sought, the court shall consider

"(1) whether common questions of law or fact predominate over any question affecting only individual members;

"(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;

"(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

"(i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incapatible [sic] standards of conduct;

"(ii) adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

"(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

"(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

"(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of the individual class members are insufficient in amount to support separate actions;

"(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action." Pa.R.C.P. 1708(a).

## PREDOMINANCE OF COMMON QUESTIONS OF LAW OR FACT

Defendants did not brief the elements necessary to establish that a class action is a fair and efficient method to adjudicate the controversy, except to contend that there are questions of law or fact which are predominately individual in nature. This is a case where monetary recovery alone is sought, as opposed to equitable, injunctive, or declaratory relief. Accordingly, the seven criteria of Rule 1708 apply.

Rule 1708(a)(1) requires the court to consider whether common questions of law or fact predominate over any questions affecting only individual members. Because we addressed the issue of commonality above and found that there were sufficient common issues shared by all class members to satisfy the commonality requirement, we will not address it again here except to reiterate that we find that the common issues predominate over the individual questions.

However, as noted above in the discussion of commonality, the Superior Court of Pennsylvania in *Hanson*

*v. Federal Signal Corporation, supra,* concluded that, for purposes of Rule 1708(a)(1), the individual questions predominated over the common questions in the area of damages in the case of the firefighters who alleged that defective sirens damaged their hearing. For the following reasons, we find that portion of *Hanson* to be distinguishable from, and inapplicable to, the within case.

There are significant differences in *Hanson* and the within case concerning the frequency of exposure to the dangerous condition, the duration of the exposure, and the directness of the causal link between exposure to the condition and the onset of symptoms.

First, regarding the frequency of exposure, it is relatively rare for someone in American society to be exposed to infectious tuberculosis. On the other hand, we are constantly bombarded by noises of various types, levels and intensity.

Second, regarding the duration of exposure, the plaintiffs in the within case were exposed to the infectious tuberculosis of Dr. Rios during his contagious period once or twice, or, at most, infrequently. On the other hand, some of the firefighters in *Hanson* were presumably continuously exposed to the sirens as part of their employment, and some were exposed less frequently.

Third, concerning the relationship between the exposure and the onset of symptoms, there is a fairly direct causal link between exposure to tuberculosis, which leads to the taking of medication for prevention or treatment, which further leads to the side effects of that medication. In contrast, because of the many variables inherent in hearing loss, the connection between the sirens and the injury is much less direct and much more dependent on a case-by-case analysis.

Hearing loss can result from a number of different conditions, exposures, genetic factors and hereditary predispositions. While we are rarely exposed to tuberculosis, we are constantly exposed to noise.

As noted in *Hanson,* various factors have to be considered when evaluating the cause or causes of hearing loss, including what people do when they are not working, and other noises to which they are exposed. 451 Pa. Super. at 268, 679 A.2d at 789. The hearing of the firefighters could have been impaired because of other life circumstances such as exposure to explosions, weapons fire, industrial noises, highway noise, airplane noise, or rock and roll music. In addition, the number of times particular firefighters were exposed to the siren and the number of months or years of such exposure may vary drastically from person to person.

Moreover, certain diseases, such as Lyme disease and syphilis, can adversely affect one's hearing. One's hearing acuity and tolerance for high noise levels are also affected by one's age, sex, race and heredity.

There are some individual questions regarding the damage aspects in the within case. Although exposure to tuberculosis in our society is rare, some of the class members may have been exposed to tuberculosis from sources other than Dr. Rios. Once exposed, the risk of contracting the disease may vary according to the circumstances of the exposure. There may also be differences among the class members concerning their susceptibility to side effects from the antibiotic medication. Moreover, a few of these side effects, such as nausea and vomiting, may be the result of other common childhood ailments.

However, because of the rareness of tuberculosis, the infrequency of exposure, and the relatively direct causal connection between exposure and symptoms, the individual questions involved in the within case are insignificant in comparison to the common questions of law or fact which predominate over any question affecting only individual members. On the other hand, because of the omnipresence of noise in our society, and the frequency and duration of exposure to it, and the relative difficulty of establishing a causal connection between any particular noise and a specific hearing loss, the individual questions in *Hanson* predominate over the common questions in that case.

In this regard, the within case is much more like *Floyd v. City of Philadelphia, supra,* where a class action was approved, than like *Hanson,* where a class action was denied. In *Floyd* the exposure to toxic chlorine gas was of short duration, such exposure is extremely rare, and there was a direct connection between the exposure and the symptoms.

Moreover, questions affecting individual class members do not necessarily defeat the class action. Individual questions as to the amount of damages do not preclude a class action. *Janicik,* 305 Pa. Super. at 142, 451 A.2d at 461.

Accordingly, for all the foregoing reasons, we find that in the within case common questions of law or fact predominate over any questions affecting only individual class members.

## MANAGEMENT OF THE CLASS ACTION

Rule 1708(a)(2) requires the court to consider the size of the class and the difficulties likely to be encountered

in the management of the action as a class action. Defendants did not identify any such difficulties. However, problems of administration alone do not justify the denial of an otherwise appropriate class action because to do so would contradict the public policy favoring class actions. Moreover, the court should rely on the aid of counsel and the court's authority to control the action to solve whatever management problems the litigation may bring. *Janicik*, 305 Pa. Super. at 142, 451 A.2d at 462.

This case does not pose significant manageability problems beyond the challenges inherent in managing any class action. The bureau of health originally identified more than 2,000 individuals at risk for contracting tuberculosis. Plaintiffs originally sought class certification for a group of over 1,300 of these persons. Subsequently, plaintiffs pared that list down to 277 of the original group. Thus, the names and addresses of the 277 persons proposed to be included in this class should be readily identifiable by the bureau.

Accordingly, we conclude that the class size is manageable and that no insurmountable difficulties are likely to be encountered in the management of the case as a class action.

## RISKS OF INCONSISTENT ADJUDICATIONS

Rule 1708(a)(3) requires the court to consider the risks of inconsistent adjudication from both the plaintiffs' and defendants' viewpoints. It must consider whether separate actions would create a risk of "inconsistent or varying adjudications," Pa.R.C.P. 1708(a)(3)(i); or a risk of impeding the ability of the class members to protect their interests. Pa.R.C.P. 1708(a)(3)(ii). Although finding such

risks is not essential to certifying the class, the existence of such risks favors certification. *Janicik,* 305 Pa. Super. at 143, 451 A.2d at 462.

Here, forcing plaintiffs to individually litigate their claim would create a risk of varying adjudications and may deter plaintiffs from bringing meritorious claims. As stated by the Superior Court of Pennsylvania in *Janicik:*

"Courts may, and often do, differ in resolving similar questions presenting issues of law or fact. The precedential effect of a decision, even if incorrect, may have a chilling effect on the assertion of similar claims, and, combined with the expiring of statutes of limitation, may often 'substantially impair or impede' potential litigants' ability to protect their interests." 305 Pa. Super. at 143, 451 A.2d at 462.

Accordingly, we find that plaintiffs satisfy this requirement of class certification.

## EXTENT OF RELATED LITIGATION

Rule 1708(a)(4) requires the court to consider the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues. The court is aware of three other actions which have been filed in this jurisdiction against the two defendants in this matter and arising from the same set of circumstances.

There are three plaintiffs in *Edelman v. Sacred Heart Hospital,* Lehigh County civil action number 96-C-1910V. There are 23 plaintiffs in *Aviles v. Sacred Heart Hospital,* number 97-C-2691V. And there is one plaintiff in *Gonzalez v. Sacred Heart Hospital,* number 97-C-

2803V. Counsel for plaintiffs in the within matter, Robert G. Bauer, Esquire, represents the 24 plaintiffs in the *Aviles* and *Gonzalez* cases. Other counsel represents the remaining three plaintiffs in *Edelman.*

Thirteen of these plaintiffs are adults, and 14 are children. Two of the adult plaintiffs[15] are suing on behalf of themselves alone. The remaining 11 adult plaintiffs[16] are suing on behalf of their 14 children.[17] Six of the 11 parents[18] are suing on behalf of themselves as well.

Moreover, a review of the complaints in the three other actions reveals that most of the plaintiffs in those lawsuits may be appropriate for inclusion in one of the two subclasses we have described above. At least 15 of the plaintiffs, including 6 adults[19] and 9 children,[20] tested positive for tuberculosis. Twenty-one of the plaintiffs,

---

15. Margaret Aviles and Migdalia Gonzalez.

16. Yolanda Chiclana, Aixa Feliciano, Gladys Gonzalez Torres, Fiordalina Gutierrez, Shari Ortiz, Jaymin Patel, Manisha Patel, Marc C. Ruff, Tammy Ruff, Argentina Ventura and Tina Edelman.

17. Yolanda Chiclana for Lidia Chiclana and Taisha Chiclana; Aixa Feliciano for Aysha DeJesus; Gladys Gonzalez Torres for Frances Gonzalez and Xiomara Gonzalez; Fiordalina Gutierrez for Issac Cespedes, Jennifer Cespedes and Franklin Guzman; Shari Ortiz for William Pagan; Jaymin Patel and Manisha Patel for Ronik Patel; Marc C. Ruff and Tammy Ruff for Jocelyn Ruff; Argentina Ventura for Argelia Ventura Paredes; and Tina Edelman for Amy Thompson and Kelly Jurgill.

18. Gladys Gonzalez Torres, Fiordalina Gutierrez, Shari Ortiz, Jaymin Patel, Manisha Patel and Tina Edelman.

19. Gladys Gonzalez Torres, Shari Ortiz, Jaymin Patel, Manisha Patel, Migdalia Gonzalez and Tina Edelman.

20. Aysha DeJesus, Lidia Chiclana, Frances Gonzalez, Xiomara Gonzalez, Jocelyn Ruff, Argelia Ventura Paredes, Amy Thompson, Kelly Jurgill and Franklin Guzman.

including 7 adults[21] and 14 children,[22] underwent a course of antibiotic treatment. Eighteen of the plaintiffs, including 6 adults[23] and 12 children,[24] experienced side effects from the antibiotics.

Also, each of the three other actions currently pending have been formally or informally stayed awaiting the outcome of the within motion for class certification. On April 27, 1999 the undersigned entered a stipulated order in *Edelman* which extended the discovery deadline and other deadlines until 180 days following disposition of the class certification motion in the within case. That order was filed on April 28, 1999, after which date there are no further docket entries in *Edelman*.

On October 13, 1999, the undersigned entered a status conference order in *Gonzalez* stating that the *Gonzalez* case is not ready for jury trial because of the pending class certification hearing in the within matter. The filing of that order is the last docket entry in *Gonzalez*. The last docket entry in *Aviles* is the withdrawal of appearance by the former counsel for the hospital, which was filed on February 22, 1999. Accordingly, we conclude that there is nothing about these other lawsuits which

---

21. Gladys Gonzalez Torres, Fiordalina Gutierrez, Shari Ortiz, Jaymin Patel, Manish Patel, Tina Edelman and Migdalia Gonzalez.

22. Lidia Chiclana, Taisha Chiclana, Aysha DeJesus, Frances Gonzalez, Xiomara Gonzalez, Franklin Guzman, Issac Cespedes, Jennifer Cespedes, William Pagan, Ronik Patel, Jocelyn Ruff, Argelia Ventura Paredes, Amy Thompson and Kelly Jurgill.

23. Gladys Gonzalez Torres, Fiordalina Gutierrez, Jaymin Patel, Manisha Patel, Migdalia Gonzalez and Tina Edelman.

24. Lidia Chiclana, Taisha Chiclana, Frances Gonzalez, Xiomara Gonzalez, Issac Cespedes, Jennifer Cespedes, William Pagan, Ronik Patel, Jocelyn Ruff, Argelia Ventura Paredes, Amy Thompson and Kelly Jurgill.

would negate our determination that class certification is proper in this case.

## APPROPRIATENESS OF FORUM

Rule 1708(a)(5) requires the court to consider whether this forum, the Court of Common Pleas of Lehigh County, is appropriate for the litigation of the claims of the entire class. For the following reasons we find this to be the appropriate forum for resolution of this matter.

In paragraph 2 of plaintiffs' second amended complaint filed May 29, 1997 it is averred that all plaintiffs are either adult individuals or minor children who reside in Lehigh County, Pennsylvania.[25] All of the transactions which took place in this case occurred in Lehigh County. The hospital and clinic where plaintiffs allege that each potential class member was, or may have been, exposed to defendant Dr. Rios are each located in Allentown, Lehigh County, Pennsylvania.

The Allentown Health Bureau is located in Lehigh County as well. Almost all of the testing of the class for tuberculosis and the administration of antibiotic medication and other treatments occurred in Lehigh County as well. Finally, nearly all of the expected witnesses are located in Lehigh County.

Accordingly, we find that Lehigh County is the appropriate forum for litigation of the claims of the entire class.

---

25. At the class action hearing, plaintiff Lisa Kozero testified that she subsequently moved to Lehighton, Carbon County, Pennsylvania, which adjoins Lehigh County. Notes of Testimony of the testimony of Lisa Kozero at the hearing held February 5, 1999, pp. 120, 127-28.

## COMPLEXITIES AND EXPENSES

Rule 1708(a)(6) requires the court to consider whether in view of the "complexities of the issues" or the "expenses of litigation," the separate claims of the individual class members are insufficient in amount to support separate actions.

As stated by the Superior Court in *Janicik:*

"To prevail on individual claims, class members would be forced to retain separate counsel and pay court costs, thus duplicating expenses. Moreover, small, but meritorious claims may go unlitigated . . . . The mere possibility that class members may maintain individual actions is not necessarily fatal to class certification . . . . Forcing multiple individual claims might not only be potentially unfair to the litigants, but it could prove inefficient, for if the numerous beneficiaries did eventually bring individual suits it could unnecessarily clog court dockets with repetitive litigation." 305 Pa. Super. at 144-45, 451 A.2d at 463. (citations omitted)

The within litigation sounds, in part in simple negligence, in part in corporate negligence, and in part in medical negligence. Although class actions are more typically brought in cases involving products liability, passenger airline crashes, interpretation of insurance policies, or other standard contracts, we know of no reason why a class action should not be certified in an appropriate professional negligence case.

Because this action sounds, in part, in medical negligence, it will be necessary for plaintiffs to employ an expert to establish the contagiousness of tuberculosis, the specific susceptibility of infants to the disease, the nature and validity of testing procedures, the appropri-

ate treatments for both those exposed to the disease and those contracting it, the customary side effects of both the disease and the prophylactic medication, the appropriate standards of care for both doctors and hospitals in a case of this nature, and so forth. Moreover, a considerable amount of discovery may have to be undertaken.

From the nature of the facts in dispute, it can be inferred that the amounts of class members' claims will vary somewhat, from smaller claims to more significant claims. The complexity of the issues involved and the anticipated expenses of litigation do not appear to be significantly greater or smaller than the average malpractice case. However, the economies of the situation may not justify the expense of individual actions in the case of the smaller and average size claims. Even where individual plaintiffs or their counsel would be willing to risk financing the litigation, multiple separate suits would result in much needless duplication of expenditures.

Thus, a review of all the circumstances under this criterion indicates that a class action is a fair and efficient method of adjudicating this controversy.

## POTENTIAL RECOVERY

Rule 1708(a)(7) requires the court to consider whether the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action. *Kelly v. County of Allegheny,* 519 Pa. 213, 546 A.2d 608 (1988).

The nature of the claims is such that, should the class prevail, its members would receive more than trivial sums. We are unable to determine at this time the full

extent of the monetary value of plaintiffs' claims. But in the absence of any argument to the contrary from defendants, we are constrained to accept plaintiffs' contention that their potential recovery is not "de minimis" in relation to the costs of the litigation.

Here, the expense of locating the potential class members should be minimal because of the records of the bureau. As stated above, plaintiffs will need expert witnesses to prove their claims. There will be expenses associated with those expert opinions and that expert testimony. However, it is unlikely that the costs of requisite notice to class members or the costs of expert witnesses and discovery would be disproportionate to the size of their collective claims.

Consequently, this action may yield sufficient benefits to the class members to justify its use of judicial resources.

## CONCLUSION

For all the foregoing reasons, we grant plaintiffs' motion for certification of class action. The specific definition of the class which we are certifying is contained in the order accompanying this opinion.

Pennsylvania Rule of Civil Procedure 1710(d) provides, in part, that a class certification order "may be conditional and, before a decision on the merits, may be revoked, altered or amended by the court on its own motion or on the motion of any party." Accordingly, our order provides that the class certification is conditional, and that it may be revoked, altered or amended after additional class discovery is completed. The order provides that all class discovery for the purpose of identifying all

50

class members and subclasses shall be completed by October 31, 2000.

For reasons expressed in the within opinion, we have granted plaintiffs' request to designate seven of the 11 named adult plaintiffs as class representatives to pursue the class action on behalf of all members of the class. However, for other reasons expressed above, we have denied plaintiffs' request to designate the four remaining adult plaintiffs as class representatives.

Next, we have directed plaintiffs to submit by November 1, 2000, a proposed written class notice pursuant to Pa.R.C.P. 1711 and 1712. Pursuant to Pa.R.C.P. 1712(c) we have directed defendants to file by November 13, 2000, a written acceptance of the proposed class notice, or to file written objections thereto together with an alternate proposed written class notice.

Finally, pursuant to Pa.R.C.P. 1711 and 1712 we have scheduled a class notice hearing for November 28, 2000 for the specific purposes enumerated in the accompanying order.

## ORDER

Now, June 20, 2000, upon consideration of the motion for certification of class action filed by plaintiffs September 17, 1997; upon consideration of the response on behalf of defendant Sacred Heart Hospital to plaintiffs' motion for certification of class action, which response was filed October 1, 1997; after the pleadings were closed; after completion of extensive discovery; after class certification hearings held November 24, 1998 and February 1 and 5, 1999; after closing arguments heard on February 2, 2000; upon consideration of the briefs of

the parties; it appearing that all requirements and pre-requisites of Pa.R.C.P. 1702, 1707, 1708 and 1709 have been complied with; and for the reasons expressed in the accompanying opinion:

It is ordered that plaintiffs' motion for certification is granted, in part.

It is further ordered that the following plaintiff class is certified as to:

All persons, including minors, parents of minors, and adults, who:

(1) between November 1, 1995 and February 21, 1996, at Sacred Heart Hospital or the Sacred Heart Hospital Clinic, both in Allentown, Pennsylvania, or elsewhere, came into direct contact with, were exposed to, or were in close proximity with, Nestor Rios M.D., at a time when Dr. Rios was infected with active tuberculosis;

(2) were identified by the Allentown Health Bureau as having been in direct contact with, exposed to, or in close proximity with, Nestor Rios M.D. during that period;

(3) were administered blood tests, tuberculin skin tests or x-rays as a result of these contacts with, or exposure to, Nestor Rios M.D.; and

(4) either:

(A) tested positive for tuberculosis and were medically treated for the condition; or

(B) received prophylactic antibiotic medication therapy with the antibiotics Rifampin or Isoniazid, or other medication, and who have suffered adverse side effects from the medication, including

(i) nausea;

(ii) vomiting;

(iii) loss of appetite;

(iv) irregular stool;

(v) irregular urine;

(vi) abdominal cramps;

(vii) flu symptoms;

(viii) fatigue;

(ix) discoloration of the skin;

(x) skin rashes;

(xi) headaches;

(xii) drowsiness;

(xiii) dizziness;

(xiv) disturbed vision;

(xv) impaired hearing;

(xvi) numbness; or

(xvii) tingling.

It is further ordered, pursuant to Pa.R.C.P. 1710(d), that the within class certification is conditional, and that after additional class discovery is completed, and before a decision on the merits, may be revoked, altered or amended by the court on its own motion or on the motion of any party.

It is further ordered that the request to designate Randy Hannis, Dawn Hannis, Robert Kline, Gina Kline, Trinette Kraftician, Lisa Kozero and Valerie Santiago as class representatives to pursue the class action on behalf of all members of the class is granted.

It is further ordered that Randy Hannis, Dawn Hannis, Robert Kline, Gina Kline, Trinette Kraftician, Lisa Kozero and Valerie Santiago are designated as class representatives to manage, conduct and prosecute the within class action on behalf of all class members pursuant to the Pennsylvania Rules of Civil Procedure, applicable case law, and the within opinion.

It is further ordered that the request to designate Luis Rodriguez, Elizabeth Rodriguez, Harold Rockman and Claudette Jenson as class representatives is denied.

It is further ordered that all class discovery for the purpose of identifying all class members and subclasses shall be completed by October 31, 2000.

It is further ordered, pursuant to Pa.R.C.P. 1711 and 1712, that on November 28, 2000 at 9:30 o'clock a.m. in courtroom 2, Lehigh County courthouse, a hearing shall be held before the undersigned to designate the names and addresses of all class members; to establish the final definition of the class and any subclasses; to specify the class members to be notified; to specify the type and content of the notice to be used; to establish the method of service of the notice upon the class; to fix the date by which class members must file a written election to be excluded from the class; to designate in the notice a person or persons to answer inquiries from, furnish information to, or receive comments from, members or potential members of the class with respect to notice; and to address such other procedural matters as may advance the efficient disposition of the within class action.

It is further ordered that on or before November 1, 2000 plaintiffs shall provide all counsel and the undersigned with a proposed written class notice pursuant to Pa.R.C.P. 1711, 1712 and this order for approval by the court.

It is further ordered, pursuant to Pa.R.C.P. 1712(c), that on or before November 13, 2000 defendants shall file a written acceptance of the proposed class notice, or file written objections thereto together with an alternate proposed written class notice.